[Civ. Nos. 20919, 20933.   Second Dist., Div. Two.   Oct. 26, 1955.]

PATRICIA K. OLSON et al., Appellants, v. BASIN OIL COMPANY OF CALIFORNIA (a Corporation) et al., Respondents.

(Two Cases)

Richard Richards; Richards, Watson, Smith & Van Petten, and Kenny & Morris for Appellants.

Thomas A. Wood, Larwill & Wolfe, Chandler, Wright, Tyler & Ward and Hartke & Brant for Respondents.

FOX, J.—This is a stockholders' derivative suit against Basin Oil Company of California, hereinafter referred to as Basin, and C. G. Willis, its president. Defendants filed separate motions to require plaintiffs to furnish security to

cover reasonable expenses, including attorney's fees, that are likely to be incurred in connection with the action. These motions were pursuant to the provisions of the Corporations Code, section 834. After a hearing, based on voluminous affidavits, the trial court found "that there is no reasonable probability that the prosecution of the cause of action alleged in the complaint against the moving parties . . . will benefit the defendant Basin Oil Company or its security holders." The court thereupon ordered plaintiffs to deposit security for such probable reasonable expenses within 30 days. Plaintiffs failed to deposit the required security. The action was thereupon dismissed. Plaintiffs' main appeal (No. 20919) is from the judgment of dismissal. (Plaintiffs also appeal— No. 20933—from certain orders made after the judgment of dismissal. The issues on this appeal will be discussed later.)

## STATEMENT OF CASE

Plaintiffs seek to impress a trust in favor of Basin on the interest of Willis in certain oil leases in the East Los Angeles area, and demand an accounting of the moneys received by him in his operations therefrom. Their theory is that Willis individually seized a corporate opportunity which rightfully belonged to Basin.

## QUESTIONS

There are two basic questions on the main appeal: (1) did the trial court, on the record, abuse its discretion in determining that there was no reasonable probability that the prosecution of this action would benefit Basin or its security holders; and (2) was the amount of security required to be posted unreasonable?

## BACKGROUND

Defendant Willis is a trained and experienced geologist and petroleum engineer, having had postgraduate work in those fields. From 1921 to 1928 he was employed as a geologist by various major oil companies, spending considerable time working on the geology and the oil potential of the Los Angeles area, and, among other things, prepared a complete geological report of the area covered by the leases which are involved in this action. During this period he had an opportunity to review the reports of numerous geologists working for these companies and thus gained a great amount of geological information as to the oil production areas in the Los Angeles basin as well as elsewhere.

In 1928 he started out on his own, doing independent geological research in the Los Angeles territory and soon became an independent oil operator. As such, he leased certain land in the vicinity of Signal Hill and organized the Hildon Oil Company, of which he was president, for the development thereof, with the understanding, however, that he would have the right to retain his status as an individual oil operator and to continue his search for other oil fields on an individual, independent basis.

### ORGANIZATION OF BASIN

In 1938, Willis reviewed the geological work he had directed some years before in the Manchester Avenue area in East Inglewood. He concluded that oil could be developed there and, individually, took leases in that area. For the purpose of developing these leases, Willis organized Basin. He assigned these leases to Basin, reserving, however, certain overriding royalties. He purchased 3,000 shares of Basin's stock for cash and became a director and president 'of the corporation. Oil was discovered in paying quantities on these leases.

During the first six months Willis received no salary for his services as president of Basin. Effective, however, on January 1, 1939, the board of directors voted Willis a salary of $500 a month. The minutes of that board meeting disclose that Willis stated ''that while he would devote the necessary attention to Basin's affairs, he still wanted to retain his status as an independent operator, especially since he [had] other oil interests such as Hildon Oil Company and Desert Oil Company.'' He advised the board that his business had always been that of a petroleum engineer and oil operator and that it was his intention to continue in this business independently, and that he expected to procure other properties for oil development purposes and desired to feel free to deal with and develop the same as he might see fit.

When the development of the Manchester Avenue area was completed, Willis' salary was reduced to $200 a month. Later, however, it was restored to $500 and has been kept at that figure since 1945. The minutes of the meeting at which this increase was voted show that it was ''with the understanding that he was still to have the right to continue his status as an independent operator.''

### AUTHORIZATION OF CONTRACT OF FEBRUARY 13, 1945

Prior to September 13, 1944, Willis had acquired, at his individual expense, certain oil leases in the industrial section

of Inglewood. At a meeting of the board on October 5th Willis advised the members that he had personally acquired these leases in the Inglewood area; that the company had spent no money in connection therewith, and had no interest therein. He indicated, however, his willingness to make a deal with Basin for financing the development of these leases. As a consequence, a deal was made by which Willis agreed to assign the leases to Basin with the understanding, however, that he would maintain his status as an independent oil operator and that an agreement would be drawn which would recognize his status as such and would not limit his activities outside the Inglewood area. To effectuate this purpose, Basin employed John C. MacFarland, of the law firm of Gibson, Dunn and Crutcher, as special counsel, to prepare the necessary corporate resolution and agreement between it and Willis. Such resolution was offered at the board's meeting on October 11, 1944, by Director Asa Call, and unanimously adopted, Willis, however, not voting. This resolution contained, *inter alia*, the following recitals:

"WHEREAS, Cornelius G. Willis, the president of this corporation has, in his individual capacity as a petroleum engineer and oil operator, investigated certain territory in the industrial section of the City of Inglewood . . . and, in such individual capacity as an independent petroleum engineer and oil operator, has acquired certain leases and is in the process of acquiring other leases covering said area.

" .  .  .  .  .  .  .  .  .  .  .  .  .

"WHEREAS, all of the directors of this corporation are cognizant of the financial interests of Mr. Willis in his individual capacity in said transaction and the directors have come to the conclusion that said proposal of Mr. Willis is fair and that the proposed contract or transaction is just and reasonable as to this corporation; and

"WHEREAS, the directors of this corporation and Mr. Willis desire to agree upon an area in the general neighborhood of the territory in which it now operates and the territory in which it will operate under the leases so to be assigned by Mr. Willis to it, in which area Mr. Willis will not carry on any operations, transactions or negotiations whatsoever except for the benefit of, and on behalf of, this corporation, and to agree that in all territory outside of said area Mr. Willis shall be permitted to carry on operations, transactions and negotiations in his individual capacity as a petroleum engineer and oil operator, without obligation to account to this cor-

poration for any such operations, transactions or negotiations; . . ."

It was then resolved that "said agreement contain a paragraph or clause satisfactory to said officers in which Mr. Willis will agree that in the area described . . . he will not carry on any operations, acquire any leases, make any geological explorations, or otherwise deal in or with said properties or with the owners thereof, except for the benefit of and on behalf of this corporation, but that in all other territory, outside of the above described property . . . Mr. Willis shall be free to operate in his individual capacity as a petroleum engineer and as an oil operator without any obligation to account to this corporation for any advantage, benefit or profit, financial or otherwise, which he may obtain as the result of his operations therein."

At the time this contract was authorized, Basin had 270,000 shares outstanding. Five of its six directors were present and they, together with their immediate families, owned 194,895 shares of Basin's stock. Pursuant to the foregoing resolution, an agreement was prepared by Mr. MacFarland which was executed by both Willis and Basin under date of February 13, 1945. Paragraph 10 of that agreement reads as follows:

"10. Willis agrees that in the area described as Section 28, except the southwest quarter thereof, Section 29, the south half of Section 21, and the south half of Section 22, all in Township 2 South, Range 14 West, S.B.B.&M., he will not carry on any operations, acquire any leases, make any geological explorations, or otherwise deal in or with said properties or with the owners thereof, except for the benefit of and on behalf of Basin. Basin agrees that in all other territory outside of the above described area and of the property covered by the leases described in Exhibit 'A' and assigned by Willis to Basin and of the property covered by leases which this corporation is now operating, Willis shall be free to operate in his individual capacity as a petroleum engineer and as an oil operator and not as an officer or director of Basin, without any obligation to account to Basin for any advantage, benefit or profit, financial or otherwise, which he may obtain as a result of his operations in said territory."

Pursuant to the provisions of that agreement, the Inglewood leases were then assigned by Willis to Basin, reserving, however, certain overriding royalties to Willis individually. A well was drilled on the properties covered by these leases and oil was discovered. Thereafter, additional wells were

drilled with the result that in excess of five million dollars has been realized by Basin after payment of royalties from this discovery.

## INDEPENDENT OPERATIONS OF WILLIS

During the time of Basin's existence, and while he was president and a director thereof, Willis engaged in various outside activities as an independent operator. Basin actually participated in some of these operations but did not participate in others. One of Willis' independent ventures was in the Lost Hills area of Kern County. He formed a corporation, of which he was president, for the purpose of drilling in that territory. Basin, as well as most of its stockholders, was interested as a stockholder in this corporation. The venture, however, did not prove successful.

In 1939 or 1940 Willis organized a corporation known as California Exploration Company for the purpose of drilling a test well in the Buttonwillow area of Kern County. Basin was not offered an opportunity to participate in this venture, which also proved unsuccessful.

In 1940, Willis' formed a limited partnership, of which he was the general partner, for the purpose of taking over a one-half interest in a lease which he had acquired in the Newhall area. This limited partnership was called the Valley Company, and Hildon Oil Company participated in it as a limited partner. A well was drilled on this lease which produced oil in paying quantities. Subsequently, the Valley Company transferred its interests in this lease to General Exploration Company of California, hereinafter referred to as General Exploration. Later, Willis sold the one-half interest which he had retained in this lease to another oil company. The property is now being operated by General Exploration for its account and that of the other company.

In 1944 Willis acquired a lease on the O. T. Johnson property at Imperial Boulevard and Western Avenue, in Los Angeles. On January 3, 1945, Willis offered Basin an interest in this lease subject to an operating agreement with General Exploration. This offer was accepted by a resolution which was unanimously carried, Willis and Director Campbell, however, not voting since they each had an interest in the property and in General Exploration. These disclosures were recorded in Basin's minutes of that date. A well drilled on this property did not prove to be productive.

Also in 1944, Willis secured leases in the East Los Angeles

area not far from the leases which are involved in this action. He organized a limited partnership known as Rio Hondo Company; he was general partner and others were limited partners. Three nonproductive wells were drilled in this territory. Basin did not participate in this venture but knew of the operations and leased lands in its own name in the general area with the hope that the exploration by Willis and his partners would be productive and would prove up the Basin leases.

In 1948 Willis secured leases in the Yorba Linda area. Interests therein were assigned by him to Basin, General Exploration, and to another company. Willis, however, retained a personal interest in these leases. A well was drilled which turned out to be a dry hole.

In 1950 Willis secured a lease of some 720 acres in the Newhall district. He sublet a portion to General Exploration, retaining an overriding royalty. A test well proved unproductive. In January, 1953, he obtained additional acreage adjoining the 720 acres above mentioned and organized a group to drill this acreage in exchange for a one-half interest in both properties. This group included Basin, and Willis individually. A test well failed to produce oil.

### The East Los Angeles Area Leases

In February, 1953, Rouse Simmons, president of Bolsa Chica Oil Corporation, learned that a broker representing Bankline Oil Company and others was offering a one-half interest in certain, as yet unproductive, oil leases in the East Los Angeles area for a commitment to deepen a test well on these leases to a depth of 8,000 feet. Simmons knew of Willis' specialized knowledge of the general area resulting from his previous extensive operations in that vicinity, and referred the broker to Willis. In a telephone conversation with Willis, Simmons advised him that if, in his opinion, "the play looked attractive and could be acquired, he would wish to take a part of it for his company," Bolsa Chica Oil Corporation. The broker called on Willis and submitted the matter to him. It appeared that the cost of deepening the well would be between $30,000 and $60,000 and that it was necessary to act promptly or the deal might be lost. Willis thereupon personally accepted the one half interest in the leases and in exchange therefor personally assumed the obligation of deepening the well, known as Fluor No. 1. Thereafter Bolsa Chica Oil Corporation assumed 25 per cent of the Willis commitment for a like interest, Christopher Oil

Company assumed 20 per cent, and General Exploration assumed 15 per cent, leaving 40 per cent for Willis. It was agreed that General Exploration would be the operator for the group. By the end of February preliminary documents were completed between General Exploration and Bankline.

At a regular meeting of the board of directors of Basin on March 4, 1953, at which four of its five directors were present (Director Howard W. Wright being absent), a 20 per cent interest in the venture was offered Basin by Willis in consideration of Basin's assuming 20 per cent of the costs of deepening the well. A resolution to accept this offer resulted in a tie vote. A resolution was then offered that Basin accept, if it could be obtained, a 40 per cent participation in this project, or, if a full 40 per cent participation and interest could not be obtained, that Basin should not acquire any interest therein. This resolution also failed of adoption by reason of a tie vote, Willis voting in the negative. Willis thereupon withdrew his offer for Basin's participation.

At that time Willis was not only a stockholder, director and president of Basin but held like relationships in General Exploration. Both companies and Willis maintained their offices in the same suite. Mr. Beament was a director and officer of Basin and also a vice president of General Exploration and was on the payroll of both companies. Mr. Wright was a director of both Basin and General Exploration and counsel for both companies and Willis. Mr. Quinn and Mr. Purcell were the other directors of Basin, and neither of them appears to have been identified in any other official capacity with Basin nor with any of the other companies.

At a special meeting of the board on March 19th a resolution was adopted to retain the law firm of Gibson, Dunn and Crutcher as special counsel to advise Basin with respect to its rights in connection with the East Los Angeles leases. In the meantime the deepening of Fluor No. 1 well proceeded under the arrangement hereinabove recited, Willis having a 40 per cent interest therein. The well turned out to be a dry hole and was abandoned.

At a board meeting of Basin's directors on May 6, 1953, William L. Murphey replaced Wright as a director. At that meeting Willis advised the board that he felt there was a possibility of oil in the East Los Angeles area. He stated that further development operations were being considered, and there was a possibility he would again offer Basin participation in the operation. A committee, consisting of Directors Pur-

cell, Murphey and Beament, was appointed to obtain independent advice as to the geology, land values, and the oil potential of the area so that recommendations could be made to the board in the event any offer of participation in the development of these leases was again presented to the board for its consideration.

At a meeting on July 1, 1953, the opinion of Gibson, Dunn and Crutcher, dated June 12th, was presented to the board, in which doubt was expressed as to the right of Willis to acquire for his personal account any interest in the leases here in question. The basis for their doubt was that, apart from the contract of February 13, 1945, the acquisition of such interest was a corporate opportunity which belonged either to Basin or, perhaps, both to Basin and General Exploration. The opinion noted: (1) Willis' conflicting positions; (2) the interlocking directorate between Basin and General Exploration; and (3) absence of an independent majority of the board of directors of Basin. Counsel advised that lacking an independent majority of the board, or independent oil advice, they were unable to conclude that the contract of February 13, 1945, would permit Willis to accept business opportunities at will without regard to the position of Basin.

At the same meeting of the board, there was presented an opinion from the law firm of Hartke & Brant, dated June 30th, which advised that the contract of February 13, 1945, was valid and binding upon the parties thereto; that the Fluor well proposition was not a business opportunity seized by Willis or diverted from Basin but was a proposition referred to him as a result of his previous operations in and familiarity with the East Los Angeles area, and that he was under no obligation to account to Basin with respect to any interest he had acquired in that field. At this same meeting of the board, Willis advised that plans were under consideration for the drilling of another well on the East Los Angeles leases and if Basin wished to participate therein he recommended that it make its decision at once and he would endeavor to obtain at cost such interest as Basin desired.

At a special meeting of Basin's board on July 21, 1953, Director Murphey, as chairman of the committee previously appointed for the purpose of obtaining advice as to the geology and possibility of oil in the East Los Angeles area, presented the following report: "That a geological report on a portion of the East Los Angeles area had been submitted by Roy C.

Mead, Petroleum Engineer and Geologist under date of July 14, 1953, and said report indicated Mr. Mead's opinion that there was no closure to the north of this area, and included his recommendation that the company not participate in any development in the area." The committee then recommended to the board that Basin not participate in any development in the area, which is the same area covered by the leases involved in this action. Willis, however, stated, as shown by the minutes of the meeting, that he did not agree with the conclusions reached in Mead's report and that he and his associates would, in all probability, proceed wtih the drilling of another well on this property. Thereafter the following resolution, proposed by Director Murphey and seconded by Director Purcell, was adopted by the vote of four of Basin's five directors, Willis abstaining from voting:

"Resolved that this corporation not acquire any interest in the block of leases in the East Los Angeles area hereinbefore referred to as the East Los Angeles Area Leases, and that it not participate to any extent whatsoever in the drilling of a well thereon." Thereafter Willis and his associates determined that a new test well should be drilled and a new lease arrangement was effected on this East Los Angeles area. The well was to be drilled by General Exploration, as operator, for a group with the following interests in the leases:

| | | |
|---|---|---|
| General Exploration | 20 | per cent |
| C. G. Willis | 55 | per cent |
| Bolsa Chica | 10 | per cent |
| Christopher Oil Co. | 5 | per cent |
| National Oil Company | 10 | per cent |

On August 24th, Willis reported the foregoing to the board of directors of Basin and stated that the cost of deepening the previous well (Fluor No. 1), which had been abandoned, was approximately $51,000 and that it was estimated the cost of the new well would be less than $75,000. Willis also stated that he had given considerable study to the Mead report and had substantial differences of opinion with respect thereto, all of which had been discussed in detail with Mr. Mead.

Willis thereupon offered Basin a 10 per cent working interest on the basis that Basin assume approximately $5,100 of the cost of deepening Fluor No. 1 well and assume 10 per cent of the cost of drilling a new well estimated not to exceed $7,500, thus making a total proposed commitment on the part of Basin of a little more than $12,000. Willis reported that all arrangements for financing the new well had been com-

pleted, that the development would go ahead in any event, and that he had confidence in the area and hoped Basin would participate. There was considerable discussion of the proposition by the board, including consideration of a supplemental report by Mead dated August 24, 1953, in which he recommended participation by Basin to the extent of 10 per cent, at a total cost not to exceed $12,500. A resolution was thereupon adopted providing for Basin's acceptance of a 10 per cent interest on the proposed basis. The resolution was adopted by the affirmative vote of three directors, Willis abstaining and Director Purcell voting in the negative.

Thereafter a well was drilled on these leases, successfully completed and placed on production about September 26, 1953. It has continued to produce oil and gas in paying quantities.

At the annual stockholders' meeting on October 14, 1953, the number of directors was increased from five to seven. Directors Willis, Beament, Murphey, Purcell and Schmid (who had been elected during the summer to fill the vacancy created by Director Quinn's resignation) were reelected. Ross McCollum and Charles H. Quinn (who earlier had been replaced by Schmid) were also elected directors.

On December 8, 1953, a letter was addressed to Basin by Robert W. Kenny, as attorney for plaintiffs in this suit, requesting Basin to institute an action on its own behalf against Willis, and enclosing a copy of the complaint herein.

Thereafter, the board of directors employed Thomas A. Wood and Larwill and Wolfe, attorneys, to investigate the facts and law applicable to the proposed complaint. Such an investigation was made and a written opinion by said attorneys was submitted to Basin under date of December 29, 1953. Counsel took the view that the agreement of February, 1945, was valid and binding on both parties, that the parties performed under it and accepted its benefits for many years, that there had been no impropriety on Willis' part in his dealings with Basin, and that Basin not only had no right of action against Willis, but that an attempt on its part to disaffirm the contract might result in a termination of its rights in the Inglewood leases and their reacquisition by Willis.* It

---

*This possibility of forfeiture is based on section 11 of the agreement reading, in part, as follows:

"11. Time is hereby declared to be of the essence of this agreement. In the event of the failure by Basin to perform any of its agreements or covenants herein contained, and the continuance of such failure for a period of thirty (30) days from and after the date of service of written

was suggested, however, that it was possible for Basin to file an action for declaratory relief to determine Willis' right under the contract to act as an independent oil operator while serving as a director and officer of Basin. In accordance with the advice contained in said opinion, the board of directors, on January 6, 1954, adopted a resolution stating that the institution of the action proposed by plaintiffs against Willis "is not for the best interests of this corporation" and resolving that the corporation decline to institute the requested action against him.

Plaintiffs thereupon filed the complaint herein on January 11th.

On February 3d the directors adopted a resolution, Willis abstaining, directing the attorneys for Basin, generally, to maintain neutrality between the plaintiffs in this action and Basin.

### LIMITATIONS OF DECISION

In a proceeding under section 834, Corporations Code, "A determination as to the furnishing of security is not a determination of the merits of any issue in the action." (*Beyerbach* v. *Juno Oil Co.*, 42 Cal.2d 11, 16 [265 P.2d 1].) Also, "It is for the trial court to weigh the evidence and its finding, based upon substantial conflicting evidence, is in this as in every civil case binding upon the appellate court." (*Wood* v. *Gordon*, 112 Cal.App.2d 374, 376 [246 P.2d 84]; *Beyerbach* v. *Juno Oil Co., supra*, p. 24.) It therefore follows that our inquiry must be directed to whether there is substantial evidentiary support for the court's determination that there is no reasonable probability that the prosecution of this suit will benefit Basin or its security holders.

### NO ABUSE OF DISCRETION IN REQUIRING SECURITY

An examination of the evidence recited herein discloses that there are five significant facts with their respective

notice given to Basin by Willis at the office of Basin at Los Angeles, California, specifying the agreement or covenant as to which Basin is in default, Willis shall have the right at his option to terminate this agreement and Basin's rights hereunder and shall be entitled to the reassignment to Willis of all of Basin's rights under said lease.

"Upon any reassignment of Basin's rights to Willis as provided in this paragraph '11' hereof, all obligations of Basin under this agreement shall cease and determine as to the lands embraced in such reassignment and the production therefrom, except Basin's obligation to pay to the lessor under said lease any royalty theretofore accrued thereunder and unpaid on account of substances produced by Basin from such lands, and to pay to Willis any overriding royalty theretofore accrued and unpaid on account of substances produced by Basin from such lands. . . ."

attendant circumstances that furnish strong and substantial support of the court's ruling. The first of these is the contract of February 13, 1945, between Basin and Willis, and particularly paragraph ten thereof. The provisions of this contract are clear and specific. It expressly provides that outside of the Inglewood area *"Willis shall be free to operate in his individual capacity as a petroleum engineer and an oil operator and not as an officer or director of Basin, without any obligation to account to Basin for any advantage, benefit or profit, financial or otherwise, which he may obtain as a result of his operations in said territory."* (Emphasis added.) The resolution authorizing the execution of this contract was offered by Director Asa Call and unanimously adopted by the board, Willis not voting. There is no suggestion that the members of this board were not independent and completely free to exercise, individually and collectively, their best business judgments. The directors who approved this contract then owned 194,895 of the 270,000 shares of Basin's issued and outstanding capital stock.

This contract was supported by a valuable consideration for it resulted in Willis' assigning to Basin oil leases in the Inglewood area from which Basin has realized between $5,000,000 and $6,000,000.

When this contract was authorized the board was well aware of the fact that Willis had other oil interests and had been operating on his own account. He advised the board, as disclosed by the minutes in January, 1939, when he was placed on salary as president of Basin, of his other oil interests and that he expected to retain his status as an independent oil operator. It was then made clear that he would not devote his full time and energies to Basin and that fact was undoubtedly taken into account in fixing his salary at a modest figure. Furthermore, the contract here in question grew out of Willis' independent activities in obtaining for his personal account leases in the Inglewood area which he assigned to Basin subject to an overriding royalty. In fact, Basin was organized to develop leases that Willis had procured as an independent operator. This fact was undoubtedly known to the board.

Of considerable significance is the conduct of the parties after the authorization and execution of the contract. This serves to give a practical construction to the contract by the parties themselves. For a period of more than eight years both Willis and Basin acted in strict conformance with its provisions. Willis continued to carry on his independent oper-

ations and to enter into new ventures from time to time, as the contract permitted, outside of the Inglewood area. Basin joined with him in some of these ventures, e. g., in the Yorba Linda and Newhall districts and in the lease on the O. T. Johnson property in Los Angeles.

Plaintiffs suggest this contract is void as against public policy. Such a result does not appear to be likely or probable in view of the circumstances under which it was authorized and executed. (See *Industrial Indem. Co.* v. *Golden State Co.,* 117 Cal.App.2d 519 [256 P.2d 677] ; *Lowe* v. *Copeland,* 125 Cal.App. 315 [13 P.2d 522] ; *Anderson* v. *Dunnegan,* 217 Iowa 672 [250 N.W. 115] ; Corp. Code, § 820.)

The second significant fact is the way in which these leases in the East Los Angeles area and the opportunity to acquire an interest therein came to Willis' attention. The circumstances under which this deal came to Willis justify an inference that it came to him personally rather than to Basin. When Rouse Simmons, president of Bolsa Chica, learned that there was a potential deal in this as yet unproductive area he referred the broker to Willis. Simmons was aware of Willis' knowledge of the area resulting from his earlier geological studies thereof and his later personal operations therein. In a telephone conversation with Willis, Simmons indicated that if Willis considered the prospects favorable he wanted a portion of the deal for his company. It is therefore reasonable to infer that Simmons was seeking the personal and professional opinion of Willis—and not that of Basin—as to the oil potential in this territory because of the former's special knowledge thereof. On that opinion he was willing to commit, and later did commit, his company to participation in the development of these leases. In these circumstances and in view of the provisions of the contract of February, 1945, the conclusion is justified that this was a Willis and not a Basin opportunity.

The plaintiffs, too, appear to have recognized the logic of what transpired for they allege in their complaint (possibly inadvertently) that the opportunity to acquire an interest in the East Los Angeles leases was "offered to defendant Willis;" that he accepted the offer, and "assumed the financial responsibility for the cost of deepening" Fluor No. 1 well.

In view of the provisions of the contract of February, 1945, and the practical construction that had been placed on it by the conduct of the parties since then, Willis naturally felt free to accept this proposition which he did immediately. Then,

as he had done on certain previous occasions, Willis offered a portion of the deal to Basin—the amount he felt the company could afford to risk in testing an unproven area.

The third significant fact is that after receiving independent professional geological advice on the area, the board voted that Basin "not acquire any interest" in the East Los Angeles area leases and that it "not participate to any extent whatsoever in the drilling of a well thereon." It will be recalled that after Fluor No. 1 turned out to be a dry hole, Willis advised Basin's board that plans were under considertion for drilling another well and that there was a possibility he would again offer Basin an opportunity to participate in the venture. He thereupon appointed a committee, consisting of Directors Murphey, Beament and Purcell, to obtain independent geological advice on the area so that the committee would be in a position to make recommendations to the board in the event Basin was later offered participation. They employed Mr. Mead. He reported there was no closure on the north and recommended that Basin "not participate in any development in this area." Although Willis stated he did not agree with Mead's report, the board voted unanimously, Willis abstaining, in accordance with the Mead recommendation. Since by this unanimous board action Basin had eliminated itself from any participation in this venture, it would seem reasonable to conclude that Willis was free to take personally whatever interest he cared to in the further exploration for oil on these leases.

The fourth significant fact is that Basin participated in the venture to the extent recommended by its independent expert. Although Mead had made an unfavorable report on the area and Basin's board had resolved against acquiring any interest in the leases or participating in drilling another well, Willis and his associates decided to make another test. Although the financing therefor had been fully provided, Willis offered Basin a 10 per cent interest in the project. Mead, in the meantime, filed a supplemental report recommending that Basin take a 10 per cent interest in the venture at a cost not to exceed $12,500. The board decided to follow this recommendation and voted to take a 10 per cent interest in the deal. In view of the speculative character of the venture, and the presumption in favor of the good faith of the directors, it is a reasonable inference that the decision of the board to follow Mead's later recommendation of a 10 per cent participation was the exercise of sound business judgment on the

part of the board, and represented the maximum risk they thought Basin should take under the circumstances.

The fifth significant fact relates to the rejection of plaintiffs' demand that suit be brought against Willis by Basin. Upon receipt of this demand the board, which had been increased to seven members, sought legal advice. Thomas A. Wood and Larwill and Wolfe were employed to prepare an opinion for the board's consideration. After reviewing the entire picture, the attorneys advised that in their opinion Willis had a legal right to acquire a personal interest in the East Los Angeles leases and personally to participate in the development thereof, and that he was not accountable to Basin for any profits made from this venture. They advised that there were insufficient grounds upon which to base an action against Willis. The board, on January 6, 1954, passed a resolution not to institute a suit against him. The board was, of course, familiar with the contract of February, 1945, and the practical interpretation that had been placed upon it by the conduct of both parties, the rejection of any participation in this venture in July, and their later decision to take a 10 per cent interest therein. It is a reasonable inference that the board had a comprehensive picture of the many facets of this matter since it had frequently been before the board over a period of months. Furthermore, "Every presumption is in favor of the good faith of the directors." (*Fornaseri* v. *Cosmosart Realty etc. Corp.*, 96 Cal.App. 549, 557 [274 P. 597].)

These facts and the other circumstances disclosed by the record reasonably justify an inference that in deciding not to institute an action against Willis the board acted in good faith and exercised its best business judgment in the interest of Basin. Such a finding would be fatal to plaintiffs' case. (*Findley* v. *Garrett*, 109 Cal.App.2d 166, 174, 178 [240 P.2d 421].) Plaintiffs, however, argue that the last cited case is not here applicable because in the instant matter Basin's directors, on February 3, 1954, passed a so-called "neutrality resolution." This resolution, however, did no more than declare it to be Basin's policy to be neutral "to the greatest extent consistent with the appearance of this corporation in said action and the prevention of detriment to this corporation as a result of said action." Such a resolution cannot, however, obviate the wholesome rule of the Garrett case that minority stockholders may not wrest control of the management of a corporation where its board has acted

in good faith and used its best business judgment in behalf of the corporation.

Plaintiffs place great emphasis on the opinion of Gibson, Dunn and Crutcher, dated June 12, 1953. That opinion is, however, subject to two limitations: (1) it is apparent from reading the opinion that the author was not supplied with full information (a) leading up to and concerning the organization of Basin, (b) relative to the practices preceding and the circumstances surrounding the authorization and execution of the contract of February 13, 1945, and (c) as to the practical construction the parties had placed on it over a period of years by their conduct; and (2) it naturally could cover only events up to June 12th. Significant actions were thereafter taken by the board which had to be taken into consideration in January, 1954, in deciding whether to authorize suit against Willis and by the court in passing on the motions for security.

As previously noted, we are not called upon to decide, and we do not decide, any of the issues in this action. Rather, it is our responsibility to ascertain whether there is substantial support for the trial court's determination that there is no reasonable probability that the prosecution of this suit will benefit Basin or its security holders. From what has been said, it is apparent that plaintiffs have a number of very difficult hurdles to surmount before they could possibly prevail. Their chances of success appear to be slight. There is substantial support for the trial court's decision.

### Basin Entitled to Security Notwithstanding Neutrality Resolution

The court found the probable reasonable expenses and attorney's fees of the moving parties to be as follows: Basin $15,000 and Willis $50,000. This latter amount was also for the benefit of Basin, insofar as it might become liable to Willis for expenses pursuant to section 830 of the Corporations Code. It therefore ordered plaintiffs to deposit security in these amounts. Plaintiffs contend: (1) no bond should have been imposed in favor of Basin since it had assumed a neutral position; and (2) there was no factual justification for the imposition of a $50,000 bond in favor of Willis. Neither of these contentions is tenable.

As a defendant in this action, Basin is entitled to have and should have counsel at all stages of the proceedings. To fail to do so would be imprudent. ■ The board obviously contemplated representation of Basin, for the so-called

neutrality resolution declared it to be Basin's policy to be neutral "to the greatest extent consistent with the appearance of this corporation in said action and the prevention of detriment to this corporation as a result of said action." It is obviously necessary for Basin to employ counsel to protect its interests in accordance with this resolution and as a practical matter. The point is specifically covered in an affidavit filed in this proceeding on behalf of Basin by its vice president, T. H. Beament. He states: "That by reason of this action, it will be necessary for this corporation to appear as defendant in said action. It will have to file pleadings and to participate in every way in said action, and by reason thereof the corporation will incur expenses including those for attorneys' fees. That in addition the corporation may become liable for expenses, including attorneys' fees incurred by the defendant, C. G. Willis, who has been sued in said action, as a director and president of this corporation. That the defendant, Basin Oil Co. of California believes that the reasonable expense which it may incur in this action, including attorneys' fees, and the additional expenses for which said corporation may become liable, pursuant to Sec. 830 may amount to $15,000.00."

The trial court could also take judicial notice of the necessity of Basin's being represented by counsel and the expense incident thereto.

### There Is Adequate Support for Amount of Security on Behalf of Willis

Contrary to plaintiffs' argument, there is substantial factual support for the amount of security the court ordered on behalf of Willis. C. H. Hartke, one of the attorneys for Willis, filed an affidavit in which he outlined the legal and accounting services that would be required in behalf of his client. He expressed the opinion that the "reasonable expense" that it would be necessary for Willis to incur would be "at least $50,000.00." Our résumé of the record herein demonstrates that this action presents a factual picture where the proof covers a considerable period of time. Many witnesses would have to be interviewed; depositions would have to be taken. A great amount of accounting work would likely be necessary. Preparation on both the facts and the law ought to be thorough. Briefs might be required. An appeal could be anticipated. The suit, potentially, involves a large amount of money. From the record before the trial judge

he could see the issues, both factual and legal; the extent and character of preparation that would be necessary; the probable duration of the trial, and the likelihood of appeal. He was at liberty to apply his own professional experience in estimating the probable reasonable expenses, including attorneys' fees, which Willis was likely to incur. There was also an affidavit before the court by Charles W. Wolfe, one of the attorneys for Basin, in which he expressed the opinion that the "reasonable expenses" that may be incurred in the defense of this action by both Basin and Willis is $65,000. It is true the total security required in the case is quite a considerable sum. It is not, however, an unprecedented amount for in *Melancon* v. *Superior Court,* 42 Cal.2d 698, 701 [268 P.2d 1050], plaintiff was required to furnish a total of $65,500 as security in a derivative stockholders' suit. Taking into consideration intricacies and ramifications of the action, we cannot say that the trial court abused its discretion in requiring plaintiffs to post $50,000 security to protect Willis in his reasonable expenses in this litigation.

There is no merit in plaintiffs' argument that the trial court abused its discretion in providing that the Willis security should also be for the benefit of Basin for the purpose of indemnifying it under section 830 of the Corporations Code. Section 834 literally provides for just this form of indemnification when it states that the security shall cover expenses and attorneys' fees "including expenses for which said corporation may become liable pursuant to section 830."

### APPEAL IN CASE No. 20933

We turn now to a consideration of plaintiffs' appeal from two orders made on November 9, 1954, following the judgment dismissing their derivative action. By way of prelude, certain additional facts need be recited.

As has been stated, plaintiff stockholders filed their complaint on January 11, 1954, for the purpose of impressing a trust on Willis' interest in certain oil leases by virtue of the acts and transactions previously described and for an accounting. On January 22, 1954, defendant Basin filed its answer and in conjunction therewith also filed a cross-complaint against plaintiffs and Willis for declaratory relief. In its answer, by way of a "First Defense" to plaintiffs' action (three other affirmative defenses are urged), Basin alleges the existence of the contract of February 13, 1945, between Willis and the corporation defining the reciprocal and correlative rights and obligations of the parties, and sets

forth its terms *in haec verba* by way of an exhibit; alleges that the contract entitled Willis to engage in independent oil operations without obligation to Basin outside the Inglewood area and that the contract provided that Willis had the right to terminate the contract and obtain a reassignment of the Inglewood leases in the event of Basin's failure to discharge its obligations thereunder; alleges the execution of this contract was duly authorized by a resolution of its board of directors; and further alleges that subsequent to the execution of this contract, a resolution was duly adopted at a meeting of the Basin stockholders on September 5, 1945, approving and confirming all acts of Basin officers and directors from the time of the last annual meeting to date. It is admitted that plaintiffs served upon the directors a draft of the within complaint and with the request that Basin initiate an action against Willis; but it is alleged that having caused an investigation to be made, the directors declined to proceed against Willis and adopted a resolution embodying their belief that the institution of the proposed action would not be for the best interests of Basin.

In its cross-complaint for declaratory relief, Basin realleges the execution of the contract of February 13, 1945, between itself and Willis and the performance of its terms by both parties. It further alleges the existence of a controversy between Willis and plaintiffs into which it has been drawn when plaintiffs delivered to it a draft of their complaint herein, coupled with the notification that if the corporation did not proceed against Willis along the lines therein proposed, said plaintiffs would file said complaint. The cross-complaint then alleges that after investigating the facts, Basin notified plaintiffs that it did not feel that the proposed suit would be for the best interests of the corporation; that it believed Willis had the right to participate independently in the oil ventures described in plaintiffs' complaint under terms of the contract of February 13, 1945; that said contract also contained a provision with reference to forfeiture of the oil leases therein assigned to Basin in the event of its failure to perform the agreement; that by reason of the existing controversy, Basin desired a declaration of its rights and duties, including the questions of the construction and validity of the contract. It prayed for a judgment decreeing that said contract was valid in all respects and binding on the parties thereto.

On January 26, 1954, plaintiff stockholders filed a demurrer to the above cross-complaint. Hearing of the demurrer was successively continued during the time the court considered the motions filed by Willis and Basin under section 834 of the Corporations Code. Plaintiffs having failed to comply with the order to deposit security within the designated time, Willis and Basin moved for entry of a judgment of dismissal. These motions were granted and a judgment of dismissal of the action as to Basin and Willis was signed on July 14, 1954.

On the day following the dismissal of their action, plaintiffs filed and served their answer to Basin's cross-complaint for declaratory relief. An analysis of this answer discloses that it is substantially a reiteration, with greater emphasis on evidentiary detail, of plaintiffs' original action to hold Willis as a constructive trustee of the East Los Angeles leases and the moneys derived therefrom. Paragraph VI of the answer alleges that plaintiffs "desire a declaration on behalf of the cross-complainant corporation that the cross-defendant Willis is an involuntary or constructive trustee of such money, property, assets and rights of which the cross-complainant corporation has been wrongfully deprived and which has been wrongfully taken by cross-defendant Willis from the cross-complainant corporation." The prayer is that the "Court declare the rights and interests of the cross-complainant corporation and the cross-defendant Willis in accordance with the allegations of this answer . . ."

On July 16, 1954, plaintiffs' demurrer to the cross-complaint was ordered off calendar. On July 20, Basin filed with the county clerk a request for dismissal of its cross-complaint without prejudice. On July 23, the clerk entered the dismissal of the cross-complaint. On August 5, Willis filed a motion to quash service of, and to strike, plaintiffs' answer to the cross-complaint. On August 10, plaintiffs filed a notice of motion to vacate the entry of the dismissal of the cross-complaint. On November 9, the court granted Willis' motion and denied plaintiffs' motion. Plaintiffs have appealed each of these orders.

## QUESTION

The fundamental question to be determined is whether Basin was precluded from obtaining a dismissal of its cross-action for declaratory relief by virtue of any purported request for affirmative relief in plaintiffs' answer thereto.

ANALYSIS OF THE PLEADINGS

From an analysis of the pleadings whose substance we have previously described, it is very clear that the issue raised by Basin's first affirmative defense in its answer and its cross-action for declaratory relief are essentially the same. In each the contract of February 13, 1945, is set forth and relied upon to nullify plaintiffs' purported right of action. In the answer, Basin sets out the contract as a defense to the derivative action. In the cross-complaint, it requests a declaration that the contract be declared valid and binding on the parties. It is thus manifest that the cross-action merely restated the affirmative allegations of the answer; it raised no issues not embraced within the issues already joined. An adjudication upon the issues formed in the original action would adequately and fully determine all matters relative to the rights and obligations of the parties under the contract pleaded in the declaratory relief action. (*Schessler* v. *Keck*, 125 Cal.App.2d 827, 837 [271 P.2d 588]; *Simpson* v. *Security First Nat. Bank*, 71 Cal.App.2d 154, 157 [162 P.2d 494]; *Citizens' etc. Pensions* v. *Board of Supervisors*, 91 Cal.App.2d 658, 660 [205 P.2d 761].) Technically, the cross-complaint was actually no more than a repetition of the first special defense comprehended in Basin's answer and required no pleading thereto by plaintiffs. (*Johnston* v. *Wheeler*, 118 Cal.App. 439, 441-442 [5 P.2d 431].) Plaintiffs' so-called answer to Basin's declaratory relief cross-complaint was simply a recasting of its original shareholders' complaint praying that judgment be rendered "declaring . . . Willis an involuntary or constructive trustee of those monies, property, assets and rights of which the corporation has been wrongfully deprived. . . .''

Bearing in mind the posture of the case as presented to the trial court—the dismissal of the original action having already been effected and the denominated cross-complaint and purported answer thereto being little more than surplus pleadings (the former being in substance only a repetition of the answer and the latter a repetition of the substance of the complaint)—it was clearly correct in its orders of November 9, 1954, striking plaintiffs' answer to the cross-complaint and denying their motion to vacate Basin's dismissal of its cross-complaint. Plaintiffs' answer was an oblique attempt to perpetuate their stockholders' derivative action, despite their failure to comply with the order requiring them to deposit security as a precondition of maintaining

such action, in the guise of a pleading requesting a declaration of ''the rights and interests of the cross-complainant corporation and the cross-defendant Willis in accordance with the allegations of this answer. . . .'' These allegations, as we have observed, constituted their alleged cause of action as minority stockholders instituting the derivative suit embodied in their original complaint. Had plaintiffs complied with the order of the trial court made under the provisions of section 834, an adjudication of the rights asserted and the issues raised in that action would have obviated any necessity for other declarations of rights. (*Schessler* v. *Keck, supra*; *Simpson* v. *Security First Nat. Bank, supra*; *Citizens' etc. Pensions* v. *Board of Supervisors, supra*; *Roberts* v. *Wachter*, 104 Cal.App.2d 281, 290 [231 P.2d 540].)

## No Abuse of Discretion

In the situation here present, the court was fully justified in refusing to entertain the action for a declaration of rights as prayed for either in Basin's cross-complaint or plaintiffs' answer thereto. The trial judge may, under section 1061, Code of Civil Procedure, refuse to declare the rights and liabilities of the parties if such declaration *''is not necessary or proper at the time under all the circumstances.''* (Emphasis added.) Since the Legislature has provided, under section 834 of the Corporations Code, a special statutory procedure governing the prosecution of derivative actions by shareholders, since plaintiffs had filed such an action but had failed to comply with the court's order to furnish security pursuant to that statute, and since the controversy between the parties could have been fully adjudicated in that action, the cross-action for declaratory relief and the answer constitute simply a reiteration of the issues joined therein. To have entertained the cross-complaint would have enabled plaintiffs to render nugatory the judgment dismissing their complaint. It would have permitted them to circumvent the processes of the court by accomplishing through indirection what they were prevented from achieving directly upon their failure to deposit the security which the court had ruled was required. It therefore being not ''proper at the time under all the circumstances'' to entertain the declaratory relief action, since it would be conducive to a frustration of the judgment dismissing the original action encompassing the same controversy, the court exercised its discretion to deny declaratory relief by the appropriate procedure of making the orders of November 9, 1954. Whether a declaration or determination is

proper in an action for declaratory relief is a matter within the trial court's discretion and its decision to deny relief will not be disturbed on appeal unless it be clearly shown, and this is not such a case, that the discretion was abused. (*California Physicians' Service* v. *Garrison,* 28 Cal.2d 790, 801 [172 P.2d 4, 167 A.L.R. 306] ; *City of Alturas* v. *Gloster,* 16 Cal.2d 46, 49 [104 P.2d 810] ; *Schessler* v. *Keck,* 125 Cal. App.2d 827, 837 [271 P.2d 588].)

The judgment of dismissal in appeal No. 20919 and the orders in appeal No. 20933 are affirmed.

Moore, P. J., and McComb, J., concurred.

A petition for a rehearing was denied November 15, 1955, and appellants' petition for a hearing by the Supreme Court was denied December 21, 1955. Gibson, C. J., and Carter, J., were of the opinion that the petition should be granted.