[Civ. No. 34277. First Dist., Div. Two. Sept. 12, 1975.]

GIULIO MARSILI et al., Plaintiffs and Appellants, v.
PACIFIC GAS AND ELECTRIC COMPANY et al.,
Defendants and Respondents.

314

**COUNSEL**

Gary J. Near, Roger W. Green and Joel Zeldin for Plaintiffs and Appellants.

McCutchen, Doyle, Brown & Enersen, Burnham Enersen, Robert Minge Brown, and Stephen Grant for Defendants and Respondents.

**OPINION**

**KANE, J.—**

### PRELIMINARY STATEMENT

In this appeal from a summary judgment entered against them, appellants do not claim that any issue of fact was presented below. Rather, they argue that the trial court misconstrued the law applicable to the undisputed facts of the case.

Appellants are three stockholders in respondent Pacific Gas and Electric Company ("PG&E"). The individually named respondents comprised the board of directors of PG&E at all times relevant to this action.

Appellants initiated the derivative action below in December 1971, challenging the propriety of a $10,000 contribution made by PG&E to Citizens for San Francisco, an unincorporated association which advocated the defeat of Proposition T appearing on the ballot in the

November 2, 1971, election for the City and County of San Francisco.[1] Appellants do not challenge the honesty or good faith of the directors of PG&E nor do they allege that the individual respondents who approved the contribution were trying to subvert the interest of PG&E or obtain a private advantage at the expense of the corporation and its stockholders. Instead, appellants contend that the contribution was ultra vires and illegal as a matter of law, and that, therefore, the individual respondents should be compelled to restore the amount of the contribution to the corporation.[2]

## Statement of the Issue

The parties concede that a single issue is presented in this appeal. Appellants describe it as "whether California Corporations Code section 802 confers the authority to allow corporate political contributions" whereas respondents state the inquiry more precisely, viz: "Does a California corporation have the power and the right to make an expenditure of corporate funds in order to resist the adoption of an initiative proposal which it reasonably believes would have a direct, adverse bearing upon its business affairs."

## The Facts

As stated earlier, there is no factual dispute in this case whatever. The uncontradicted declaration of Shermer Sibley in support of the defendants' motion for summary judgment presents an excellent statement of the facts. We therefore set it forth verbatim so that the legal issues can be brought into sharp focus.

### "Declaration of Shermer Sibley

"I, Shermer L. Sibley, declare and say:

"1. I am the Chairman of the Board of Directors of Pacific Gas and Electric Company ('P.G.&E.'); I am one of the defendants in this action; and I make this declaration on behalf of all defendants in support of their motion for summary judgment.

---

[1] Proposition T was a nonpartisan initiative proposal which, if adopted, would have prohibited construction in San Francisco of any building more than 72 feet in height without prior approval of the voters.

[2] The contribution was authorized by the executive committee of the board of directors of PG&E.

"2. This controversy arises out of a $10,000 contribution made by defendant P.G.&E. to Citizens for San Francisco, an unincorporated association which advocated defeat of Proposition T.

"3. Proposition T was an initiative ballot proposition which qualified for the November 2, 1971 election for the City and County of San Francisco. If adopted, Proposition T would have prohibited construction in San Francisco of any building more than 72 feet in height unless such construction was approved in advance by the voters.

*"Identification of Parties*

"4. P.G. & E. is a private corporation organized under and by virtue of the laws of the State of California. Its principal business is supplying its customers in the State of California with gas and electric light, heat and power. (A true copy of the Restated Articles of Incorporation of P.G. & E. is attached hereto as Exhibit A.) P. G. & E. is a public utility within the meaning of the California Public Utilities Act and is subject to the regulatory jurisdiction of the California Public Utilities Commission.

"5. At all times relevant to this action, defendants John F. Bonner, Ransom M. Cook, James F. Crafts, Charles de Bretteville, Rudolph J. Drews, Alfred W. Eames, Jr., Robert H. Gerdes, Walter A. Haas, James M. Hait, Elliott McAllister, Leon S. Peters, Richard H. Peterson, Porter Sesnon, Shermer L. Sibley and Emmett G. Solomon comprised the Board of Directors of P.G. & E. and defendants Gerdes, Sibley, Cook, Haas, McAllister and Sesnon comprised the Executive Committee of the corporation.

"6. Plaintiffs Giulio and Inez Marsili and Edward Bielski are registered owners of stock of P.G. & E.

*"The Making of the Contribution*
*and the Reasons Therefor*

"7. On or about June 10, 1971, a request was made of P.G. & E. to contribute $10,000 to Citizens for San Francisco. Thereafter an investigation was undertaken by P.G. & E. as to the organization of Citizens for San Francisco, how its campaign to defeat Proposition T would be organized and its budgetary requirements. This investigation was made at my direction. Additionally, the merits of Proposition T and its impact on P.G. & E. and on the City and County of San Francisco were reviewed by the management of the corporation.

"8. On June 29, 1971, based upon the investigation undertaken at my direction and management's considered judgment that if adopted Proposition T would have an adverse impact on P.G. & E. and on the City and County of San Francisco, I recommended to the Executive Committee of P.G. & E. that it approve a $10,000 contribution by the corporation to Citizens for San Francisco. The Executive Committee of P.G. & E. considers and passes upon all corporate contributions in excess of $1,000; and action by the Executive Committee in approving a contribution is the final corporate act necessary to authorize that a contribution be made.

"9. At its regular meeting on June 29, 1971, the Executive Committee of P.G. & E. (defendants Sibley, Cook, Haas, McAllister and Sesnon being present and voting; defendant Gerdes being absent; and defendant Bonner being present, but not voting) approved a contribution of $10,000 to Citizens for San Francisco.

"10. In authorizing the $10,000 contribution to Citizens for San Francisco, the Executive Committee based its decision upon its judgment that the adoption of Proposition T would have an adverse impact upon the corporation, and in particular would

"(a) cause an increase in the tax rate applicable to the company's facilities and thus an increase in the taxes it would have to pay; and

"(b) interfere with present and future building plans of the company, including the construction of the Embarcadero Substation at Fremont and Folsom. The Executive Committee also considered that the adoption of Proposition T would have an adverse impact on the City of San Francisco; specifically,

"(a) by increasing taxes, the passage of Proposition T would have depressed business growth in the downtown area; and

"(b) by imposing an immutable proscription on building heights, the well reasoned and flexible programs for balanced urban growth contained in the Urban Design Plan would have been frustrated and impeded.

"11. The Executive Committee of P.G. & E. considered, in good faith, that the contribution to Citizens for San Francisco was an expenditure incidental to the transaction of the business of the corporation and

expedient for the attainment of its corporate purposes and the preservation and protection of its corporate property and business interests.

"12. Pursuant to the authorization of the Executive Committee, on or about July 2, 1971, P.G. & E.'s check in the amount of $10,000 was delivered to Citizens for San Francisco.

"13. Defendants Crafts, de Bretteville, Drews, Eames, Gerdes, Hait, Peters, Peterson and Solomon were not members of the Executive Committee and, therefore, did not participate in or authorize the making of the contribution to Citizens for San Francisco.

*"Plaintiffs' Demand and Defendants' Response*

"14. On or about December 1, 1971, plaintiffs made demand on defendant Gerdes to return the sum of $10,000 to P.G. & E. and to institute the present action on behalf of the corporation.

"15. Treating plaintiffs' letter of December 1, 1971 as a written demand under Section 834 of the California Corporations Code, the Board of Directors of P.G. & E., at its regular meeting on March 22, 1972, considered the plaintiffs' demand, reviewed the facts pertinent to the transactions alleged in the complaint and the opinion of the corporations' counsel concerning the law applicable to the case, and resolved, by unanimous vote of those present and voting (defendants Sibley, Cook, Bonner, McAllister and Sesnon not voting, and defendants Haas and Peters being absent), that the proposed action was without merit and that its prosecution by P. G. & E. would not be in the best interests of the corporation. In making this determination, the voting directors had before them, considered and based their judgment upon the following advice:

"(a) The adoption of Proposition T would have increased the combined tax rate applicable to the company's property. In the 1971-1972 tax year, P. G. & E. paid $10,029,428 in property taxes to the City. The tax rate was $12.82 per $100 of assessed valuation. In the ballot arguments on Proposition T, the Controller of the City and County of San Francisco estimated that, if the initiative ordinance had been in effect on the lien date in 1971, the combined tax rate for the City, the school districts and the San Francisco Bay Area Rapid Transit District would have had to have been about 48 cents higher per $100 of assessed valuation. This would have meant an increased tax bill for the company

of about $380,000. According to the Controller, this necessary increase in tax rate would have grown to an extra $1.44 within the next 10 years, resulting in increased company taxes as applied to present assessed value of $1,135,000 per year.

"(b) The adoption of Proposition T would have interfered with the construction of necessary company facilities. The company's Embarcadero Substation, about to be constructed at Fremont and Folsom Streets, would have been prohibited by the Proposition, additional land would have to have been acquired and a complete redesign would have had to have been made. Additionally, there could have been considerable interference with the flexibility needed in future plans for new or enlarged facilities, including office buildings.

"(c) The Proposition would have been very costly to the City of San Francisco and thus to its taxpayers, by apparently requiring a special municipal election every time someone wanted to erect a building higher than six stories or 72 feet.

"(d) A study commissioned by the San Francisco Chamber of Commerce concluded that the adoption of Proposition T would reduce the number of construction jobs available in San Francisco, and would no doubt increase rents.

"(e) The management of P. G. & E. believed that the Urban Design Plan embodied a much more preferable approach to the rational control of urban land use, and that the adoption of Proposition T would have frustrated the implementation of the Urban Design Plan. The Urban Design Plan was funded by a $180,000 federal grant, it was developed by the City Planning Commission, and it was endorsed by the San Francisco Planning and Urban Renewal Association.

"(f) Assistance in the defeat of Proposition T was considered by the management of P. G. & E. to be in the best interests of the corporation and of the City and County of San Francisco.

### "*Source and Treatment of the Contribution*

"16. The $10,000 contribution to Citizens for San Francisco was made from the accumulated profits and retained earnings of the corporation.

"17. P. G. & E. did not take the $10,000 contribution or any part thereof as a deduction in its State or Federal income tax returns.

"18. The making of the $10,000 contribution was reported by P. G. & E. to the State Public Utilities Commission, and the contribution was not treated as an operating expense for rate making purposes or otherwise charged to P. G. & E's rate payers.

"I declare under penalty of perjury that the foregoing is true and correct.

"Executed this 28th day of February, 1973, at San Francisco, California.

[Signed] S. L. Sibley
Shermer L. Sibley"

## The Ultra Vires Issue

Appellants contend that the contribution in question was ultra vires "because neither P. G. & E.'s articles of incorporation nor the laws of this state permits P. G. & E. to make political donations . . . ." We disagree.

By definition adopted by appellants themselves, "ultra vires" refers to an act which is beyond the powers conferred upon a corporation by its charter or by the laws of the state of incorporation (7 Fletcher, Cyclopedia Corporations (1964) § 3400).[3]

The parties are in agreement that the powers conferred upon a corporation include both express powers, granted by charter or statute, and implied powers to do acts reasonably necessary to carry out the express powers. In California, the express powers which a corporation enjoys include the power to "do any acts incidental to the transaction of its business . . . or expedient for the attainment of its corporate purposes." (Corp. Code, § 802, subd. (b); 1 Ballantine & Sterling, Cal. Corporation Laws (4th ed.) § 34.)

---

[3]Notwithstanding their own definition of ultra vires, appellants advance a contention that corporate contributions were also ultra vires at common law. None of the authorities cited by appellants support this novel argument which we must summarily reject.

The articles of PG&E are manifestly consistent with this statutory imprimatur. Thus, for example, they authorize all activities and endeavors incidental or useful to the manufacturing, buying, selling and distributing of gas and electric power, including the construction of buildings and other facilities convenient to the achievement of its corporate purposes, and the performance of "all things whatsoever that shall be necessary or proper for the full and complete execution of the purposes for which . . . [the] corporation is formed, and for the exercise and enjoyment of all its powers and franchises."

In addition to the exercise of such express powers, the generally recognized rule is that the management of a corporation, "in the absence of express restrictions, has discretionary authority to enter into contracts and transactions which may be deemed reasonably incidental to its business purposes." (6 Fletcher, Cyclopedia Corporations (1968) § 2486, pp. 314-315.) In short, "a corporation has authority to do what will legitimately tend to effectuate . . . [its] express purposes and objects . . ." (6 Fletcher, *ibid.,* p. 317). California is in accord with this general rule also: " 'Whatever transactions are fairly incidental or auxiliary to the main business of the corporation and necessary or expedient in the protection, care and management of its property may be undertaken by the corporation and be within the scope of its corporated [*sic*] powers.' " (*Davis* v. *Pacific Studios Corp.* (1927) 84 Cal.App. 611, 615 [258 P. 440].)

■ No restriction appears in the articles of PG&E which would limit the authority of its board of directors to act upon initiative or referendum proposals affecting the affairs of the company or to engage in activities related to any other legislative or political matter in which the corporation has a legitimate concern. Furthermore, there are no statutory prohibitions in California which preclude a corporation from participating in any type of political activity. In these circumstances, the contribution by PG&E to Citizens for San Francisco was proper if it can fairly be said to fall within the express or implied powers of the corporation.

The crux of the controversy at bench, therefore, is whether a contribution toward the defeat of a local ballot proposition can ever be said to be convenient or expedient to the achievement of legitimate corporate purposes. Appellants take the flat position that in the absence of express statutory authority corporate political contributions are

illegal.[4] This contention cannot be sustained. We believe that where, as here, the board of directors reasonably concludes that the adoption of a ballot proposition would have a direct, adverse effect upon the business of the corporation, the board of directors has abundant statutory and charter authority to oppose it.

■    The law is clear that those to whom the management of the corporation has been entrusted are primarily responsible for judging whether a particular act or transaction is one which is helpful to the conduct of corporate affairs or expedient for the attainment of corporate purposes (*Bailey* v. *Babcock* (W.D.Pa. 1915) 241 F. 501, 512). Indeed, a court cannot determine that a particular transaction is beyond the powers of a corporation unless it clearly appears to be so as a matter of law.    ■    With respect to the means which the corporation may adopt to further its objects and promote its business its managers are not limited in law to the use of such means as are usual or necessary to the objects contemplated by their organization, but, where not restricted by law, may choose such means as are convenient and adapted to the end, though they be neither the usual means, nor absolutely necessary for the purpose intended (*Woods Lumber Co.* v. *Moore* (1920) 183 Cal. 497, 502 [191 P. 905, 11 A.L.R. 549]).

■    Neither the court nor minority shareholders can substitute their judgment for that of the corporation "where its board has acted in good faith and used its best business judgment in behalf of the corporation." (*Olson* v. *Basin Oil Co.* (1955) 136 Cal.App.2d 543, 559-560 [288 P.2d 952]; *Findley* v. *Garrett* (1952) 109 Cal.App.2d 166 [240 P.2d 421]).

■    Appellants, as mentioned earlier, do not contend that the individual respondents acted in bad faith, or that they acted unreasonably or for an improper purpose. Accordingly, the judgment of the board of directors cannot be disturbed by the court unless it is held, as a matter of law, that the contribution could not be construed as incidental or expedient for the attainment of corporate purposes. For several reasons which we shall set forth, such a holding would simply not be reasonable in the light of the uncontradicted record below.

---

[4]In appellants' own words: "Appellants' fundamental position is that the particular merits of the ballot proposition are totally irrelevant to the question of legality of the political contribution. Appellants contend that corporations are creatures of limited powers, derived from statutory authority, and that California law does not authorize political contributions by corporations, including PG&E."

First, the executive committee of PG&E based its decision to authorize the contribution upon its judgment that the adoption of Proposition T would have an adverse impact upon the corporation and, in particular, would increase the tax rate applicable to the company's facilities and interfere with present and future building plans of the company, including the construction of the Embarcadero Substation.

Second, the executive committee considered the adoption of Proposition T to be detrimental to the City and County of San Francisco: specifically, by increasing taxes, it would have depressed business growth and, by imposing an immutable proscription on building heights, it would have rendered the urban design plan ineffective.

Third, by requiring voter approval for the construction of any building more than 72 feet in height, the decision to construct necessary corporate facilities would depend upon the mood of the electorate rather than upon relevant business considerations. The corporation would thereby become embroiled in a contested political campaign every time it determined that it was in the corporation's interest to construct a building more than 72 feet in height.

Not only would the business judgment of the board of directors be subservient to the vagaries of an election campaign, but the cost of submitting such a proposal to the voters would undoubtedly be considerable. This is demonstrated by the very case at bench where in excess of $68,000 was spent by the supporters of Proposition T, and an even greater sum was spent by its opponents. These figures attest to the high cost of submitting a proposal to the voters and demonstrate the severe economic burden that the proposition would have imposed upon those seeking to comply with its terms.

The members of the executive committee of PG&E reasonably sought to avoid these consequences. Their judgment was not arbitrary or capricious but was based upon pertinent business considerations that were of direct and immediate concern to the corporation.

### THE ILLEGALITY ISSUE

■ Appellants argue that PG&E's contribution to Citizens for San Francisco "was illegal because it violated the important policy of the law

. that directors of corporations are fiduciaries for their shareholders and, therefore, may not give away their shareholders' money without shareholder consent." The basis for this argument seems to be that PG&E received no consideration for the contribution, and that, therefore, it was illegal (or improper).[5]

It is, of course, beyond dispute that corporations are not free to give away their assets in violation of the rights of shareholders. We are unable, however, to discern any such conduct in the case at bench.

As previously noted, prior to the making of the contribution, PG&E investigated the merits of Proposition T and the impact its adoption would have upon the business of the corporation. Based upon that investigation, PG&E determined to resist the adoption of the proposition and decided that the most effective way to do so was to support the campaign that was being organized by Citizens for San Francisco. It did not make a contribution, however, until after it was satisfied that the campaign committee was well organized, with a sufficient staff and budget to resist effectively the adoption of the proposition. The contribution to Citizens for San Francisco, therefore, was neither gratuitous nor without a corporate objective.

## THE PUBLIC POLICY ISSUE

Appellants further contend that as a matter of public policy corporate political contributions should not be sanctioned and that this court "should reaffirm the common law rule against corporate political contributions."

But this argument is based upon an erroneous premise, namely, that the directors have given away the corporation's property. As we have pointed out earlier, the contribution in question was not made in violation of any fiduciary duty for a noncorporate purpose. On the contrary, the record stands uncontroverted that the defeat of Proposition T was very much in the financial interest of PG&E and its shareholders.

---

[5] The contribution cannot be illegal in the sense of unlawful, since nothing makes it so under the laws of this state and California does not recognize nonstatutory crimes (*In re Brown* (1973) 9 Cal.3d 612 [108 Cal.Rptr. 465, 510 P.2d 1017]; *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420]; Pen. Code, § 6). Nor is it illegal in the sense of improper, since, as we have concluded, the expenditure was not ultra vires.

Furthermore, we agree with the trial judge who in an excellent and helpful opinion disposed of appellants' public policy contentions as follows: "The public policy arguments advanced by plaintiffs [appellants] may or may not be philosophically sound but . . . the judicial branch of government is not the proper forum to which such arguments should be made. The public policy arguments should be presented to the legislative branch of government where they may be persuasive."

The correctness of the above observation is borne out by the fact that the scope and manner of regulation of every state corporate political activity varies from state to state. In some states, all corporations are prohibited from making any expenditures to influence the outcome of elections. In others, only certain types of corporations are subject to the prohibition; while in still others the prohibition is limited to certain types of issues.

The California Legislature, however, has taken a different approach. Rather than imposing an absolute or limited prohibition on expenditures by corporations, the California Legislature has adopted a scheme of regulation that requires such expenditures to be reported.

Thus, each contributor, candidate and political committee subject to the reporting requirement must file a statement of receipts and expenditures received or made in connection with any county, municipal or statewide election. (See Waxman-Dymally Campaign Disclosure Act, Stats. 1973, ch. 1186; Elec. Code, § 11500 et seq.) This requirement applies to corporations as well as individuals and other groups of persons (Elec. Code, § 11515).

The California regulatory scheme is designed to assure that the identity of the source of all contributions in excess of $500 will be disclosed to the electorate. This scheme establishes the salutary objective of assisting the voter to make an informed judgment on a ballot proposition by requiring that the identity of its supporters and opponents be revealed (Elec. Code, § 11501). At the same time, it permits all citizens of the state, whether individual or corporate, to make expenditures in support of or opposition to any ballot proposition which they believe might have a significant impact upon their affairs.

This deliberate and considered form of regulation represents the public policy of this state, a policy which is emphasized by the fact that

the Legislature has repeatedly rejected attempts to impose an absolute prohibition against corporate political expenditures.

In view of our conclusion that the judgment must be affirmed for the reasons stated, we need not consider respondents' further contention that a contrary result would violate the First Amendment right of PG&E to make its views known to the electorate.

Judgment affirmed.

Taylor, P. J., and Rouse, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied November 25, 1975. Draper, J.,* and Caldecott, J.,* sat in place of Tobriner, J., and Sullivan, J., who deemed themselves disqualified. Mosk, J., was of the opinion that the petition should be granted.

---

*Assigned by the Chairman of the Judicial Council.