[Civ. No. 52418. Second Dist., Div. Two. Oct. 10, 1978.]

LEOPOLD S. WYLER, Plaintiff and Appellant, v.
CY FEUER et al., Defendants and Respondents.

**COUNSEL**

Hillel Chodos for Plaintiff and Appellant.

Harry C. Cogen and Charles A. Price for Defendants and Respondents.

## Opinion

**FLEMING, J.**—Claiming fraud and failure of consideration plaintiff Leopold S. Wyler sued to rescind a limited partnership agreement, under which as limited partner he invested $1.5 million in the production of a motion picture on the early life of French singer Edith Piaf. The jury found for the defendants, and the trial judge awarded them $125,000 in attorney's fees. Wyler appeals the adverse jury verdict and asserts as reversible error: the insufficiency of the evidence; the nonsuit on plaintiff's mismanagement cause of action; the jury instructions on failure of consideration; and the inconsistency of the jury's special verdict and its general verdict.

## Facts

Defendants Cy Feuer and Ernest Martin, associated as Feuer and Martin Productions, Inc. (FMPI), have been successful producers of Broadway musical comedies since 1948.[1] Their first motion picture, "Cabaret," produced by Feuer in conjunction with Allied Artists and American Broadcasting Company, received eight Academy Awards in 1973. Plaintiff Wyler is president and largest shareholder of Tool Research and Engineering Corporation, a New York Stock Exchange company based in Beverly Hills. Prior to 1972 Wyler had had no experience in the entertainment industry.

In 1969 Simone Berteaut wrote a best-selling book about her early life with her half-sister Edith Piaf. Martin became interested in the book as a possible motion picture, and in August 1972 FMPI acquired worldwide motion picture and television rights to the book for $50,000, plus a percentage of motion picture profits. This was the first motion picture defendants attempted to finance themselves, "Cabaret" having been financed by Allied Artists and ABC. Because defendants desired to avoid studio financing with its burdensome overhead and loss of artistic control,[2] they sought to finance the Piaf picture through a combination of: (a) private investment under a standard agreement whereby investors

[1] Over a 20-year span Feuer and Martin produced 10 Broadway musicals, which include "Where's Charlie?," "Guys and Dolls," "Can-Can," and the Pulitzer Prize winning "How to Succeed in Business Without Really Trying." These musicals were financed by investor contributions of five, ten, and fifteen thousand dollars.

[2] According to the testimony, a producer who has a percentage interest in the profits of a motion picture financed by a major studio will not receive any money on account of profits until the studio has recovered from distribution the equivalent of 2.7 times the production cost of the picture.

receive 50 percent of profits in return for 100 percent of financing, and (b) production financing. Production financing consists of advance sales of distribution rights prior to completion of the motion picture, for sums certain, payable on delivery of the film to the distributor. If both producer and distributor are favorably known in the motion picture world, the producer can obtain a bank loan, discounted at a high rate of interest and secured by the distributor's promised payment for distribution rights.

In November 1972 Feuer went to Paris to audition actresses for the lead role of Piaf, and there he discovered Bridgette Ariel, an unknown bilingual French actress who closely resembled Piaf. He also met Wyler in Paris, and the two discussed the Piaf motion picture and the financing of its budget of $1 million for a French-language version of the picture. Wyler expressed interest in the project. In January 1973 defendants decided to film French and English-speaking versions of the motion picture simultaneously, which raised their estimated budget from $1 million for the French version to $1.5 million for both French and English versions. In February 1973 Wyler and Feuer met in New York, and Wyler offered to provide $750,000 of the proposed $1.5 million budget. However, Wyler rejected the standard ratio of 25 percent profits for 50 percent financing and demanded 37½ percent of profits. Defendants' secretary interrupted this meeting to announce that "Cabaret" had been nominated for 10 Academy Awards.

On February 19 Martin and FMPI's attorney, Irving Cohen, met Wyler in Beverly Hills and told him they could not accept his money until they had commitments for 100 percent of the needed financing. Wyler offered to finance the entire $1.5 million budget for 50 percent of profits, subject to the following conditions: defendants would obtain up to $750,000 production financing outside the United States; for each $100,000 production financing so obtained defendants would receive an additional 1⅔ percent of profits; if defendants raised all the $1.5 million through production financing, Wyler would still receive 25 percent of profits for his original commitment. The parties resumed negotiations the next day with Leon Kaplan in attendance as Wyler's adviser. Kaplan, a prominent entertainment attorney, asked that Wyler be given the right to approve the final screenplay, the final budget, the completion bond surety, and United States distribution arrangements, and expressed his opinion that defendants' estimate of $750,000 from production financing outside the United States was realistic, since he thought $250,000 to $300,000 could

be raised from distribution rights in France alone. At that meeting Kaplan recalled that Warner Brothers had some motion picture rights to the Piaf story. Martin, who had been employed at Warner Brothers in 1970, replied the risk of copyright infringement would be minimal, since defendants' motion picture would be based on Berteaut's book and not on any Piaf material owned by the studio; at Warner Brothers he (Martin) had discussed the subject with Warner executives, who had not objected to his project; in any event defendants would obtain an errors-and-omissions policy to insure against liability for copyright infringement.

On 1 March 1973 a deal memorandum preliminary to the final limited partnership agreement was executed. In addition to the foregoing terms and conditions it included a provision inserted at Cohen's request that failure to raise production financing would not constitute a default but would reduce defendants' $150,000 producer's fee (payable from initial distribution receipts) by $10,000 for each $100,000 of the $750,000 not raised through production financing, down to a minimum fee of $75,000.[3]

On 13 July 1973 the parties simultaneously executed a limited partnership agreement and a modifying memorandum which increased the proposed budget to $1.6 million and the proposed production financing to $850,000 in order to take into account the appreciation of the French franc. These documents followed the terms of the deal memorandum and declared that Wyler would provide, interest free, 100 percent financing, consisting of $350,000 already advanced plus 5 million francs (approximately $1.25 million), and that defendants would obtain $850,000 in production financing outside the United States by September 30. Defendants further agreed to defer their producer's fee until Wyler's capital contribution had been repaid. With respect to defendants' obligation to obtain production financing, the agreement provided: "[Defendants] agree to obtain not less than [$850,000] of production financing in the form of nonreturnable loans repayable solely out of proceeds from distribution of the Picture or in the form of outright sales, solely from territories outside of the United States, on or before

---

[3] ". . . (ii) FMPI agrees to obtain not less than Seven Hundred Fifty Thousand Dollars ($750,000) of production financing by means of outright sales or non-returnable advances against distribution as herein set forth; provided that FMPI's failure to obtain all or part of said Seven Hundred Fifty Thousand Dollars ($750,000) shall not be a default hereunder but in such case the Production Fee shall be reduced by an amount equal to ten percent (10%) of the difference between the amount of production financing actually so obtained and the sum of Seven Hundred Fifty Thousand Dollars ($750,000); it is agreed that the maximum amount of the reduction of the production fee shall be Seventy-Five Thousand Dollars ($75,000) as aforesaid."

September 30, 1973. . . . If [defendants have] not raised the aforementioned sum by September 30, 1973 [defendants] shall continue to be under an obligation to raise such sum after said date. [*Defendants'] failure to raise the minimum sum of [$850,000] of production financing by September 30, 1973 shall not be deemed a breach of this agreement, it being agreed that the consequences set forth in Paragraph X hereof [dealing with reduction in the producer's fee] shall be [Wyler's] sole remedy . . . .*" (Italics ours.)

Despite their acclaimed success in "Cabaret," defendants at the time of execution of the limited partnership agreement were experiencing difficulties in obtaining distributor commitments and knew it would be unlikely they could obtain any production financing by the September 30 deadline. Their difficulties arose from their overestimation of the attractiveness of the Piaf subject-matter, from the unknown leading actress, and from the scheduling of photography during the summer months when most Europeans go on vacation.

Filming of the motion picture began July 23 and ended October 9. By that time Wyler had advanced $1.25 million and defendants had failed to obtain any production financing. The completed cost of the picture was $1,512,000.

Early in October, Feuer met Wyler in Paris and requested an extension of the deadline for production financing to December 30, so that defendants could take advantage of distributor negotiations in process and recoup their profit percentage and their producer's fee. Wyler said he had already financed the picture and refused to extend the deadline, thereby maintaining his profit percentage at 50 percent.

At this same meeting Wyler, on Feuer's advice, rejected a distribution offer by United Artists of $100,000 cash against a 35 percent distributor share for distribution rights in France, in favor of a French distributor's offer of nothing down but only a 20 percent distributor share. From September through December 1973 defendants actually obtained worldwide distribution contracts totalling $265,000 in firm commitments, of which $24,000 in cash had been received by March 1974. Defendants did not notify Wyler of these other distribution contacts, nor did they attempt to obtain production financing on them. Defendants attributed their inaction to two factors: (1) many of the contracts were not "bankable" because they were subject to such contingencies as a country's censorship approval or the requirement that the motion picture be dubbed in

another language; (2) high rates of discount (14 percent) made it uneconomic to bank these contracts in late 1973 when the motion picture was scheduled to open in early 1974. On advice of counsel defendants treated the $24,000 in hand and all subsequent proceeds from the $265,000 in distributor commitments as distribution receipts, which entitled them to deduct distribution expenses before reimbursing Wyler for his investment.

In March 1974 defendants previewed the French and English versions of the Piaf motion picture for Wyler in Beverly Hills. While the French version was generally acclaimed by all parties, the English version, which presented English translations of the Piaf songs, was not. At a meeting in Kaplan's office a decision was made to replace the English translations with French originals. Wyler demanded that the $24,000 received from distribution commitments be turned over to him as production financing, but this issue was not resolved.

The motion picture premiered in Paris in April 1974. On June 26 Warner Brothers filed in New York a lawsuit which sought damages for copyright infringement and an injunction against United States distribution of the Piaf film. The present action was filed by Wyler on July 22. Although a producer's representative and a publicity man for United States distribution were hired in August 1974, and although the Warner Brothers suit was settled in November 1974, the Piaf film has never been released in the United States, either for theatrical exhibition or for television. In 1975 defendants proposed a distribution contract, which was turned down by Wyler as totally unreasonable. As of 31 December 1975 the Piaf motion picture had enjoyed less than overwhelming success, with total receipts of $478,000 from distribution outside the United States, of which $313,500 went to Wyler as reimbursement for his investment.

Wyler's action sought rescission of the agreement and recovery of his investment on theories of fraud and failure of consideration, and, alternatively, sought damages for mismanagement of the business of the limited partnership. His primary contention, at variance with the express written terms of the limited partnership agreement, was that defendants had unconditionally guaranteed to obtain $850,000 in production financing, an obligation which, he asserted, not only continued past the 30 September 1973 cut-off date for recoupment of profit percentages and for reduction in the producer's fee but carried unlimited liability. Wyler asserted this oral guarantee was not included in the express terms of the agreement, because the surety needed an absolute commitment for full

financing before a completion bond could be obtained. Wyler explained the language in the deal memorandum and in the limited partnership agreement as incorrect reflections of the parties' true agreement brought about by attorney misunderstanding.

Defendants maintained that their obligation to obtain production financing was not absolute but only required them to make reasonable efforts in good faith for a reasonable period of time after completion of principal photography; that they never orally guaranteed to raise $850,000 in production financing, but at all times rejected personal liability for the financing of the picture; that Wyler was aware of their difficulties in obtaining production financing; that under the agreement failure to obtain production financing did not amount to a breach of contract, but merely reduced their deferred producer's fee to $75,000.

The jury returned a nine-to-three general verdict for defendants and returned a special verdict in the form of special findings, which indicated that the consideration for the contract did not fail, that defendants were not guilty of fraud, and that, although defendants made misrepresentations (both intentional and negligent), concealed facts, and made promises, plaintiff was not justified in relying on the representations or promises, did not rely on them in fact, and would have acted in the same manner if he had known all the facts.

## DISCUSSION

1. *Sufficiency of Evidence.* Before discussing Wyler's specific assertions we take up his basic general contention that he is entitled to get his money back from defendants. On this subject we note: (1) The parties clearly understood, as set out in the limited partnership agreement, that production of the Piaf motion picture was a speculative venture. (2) By direct inference they also understood that procurement of production financing was likewise a speculative venture, dependent on a distributor's advance evaluation of the picture's public appeal, an evaluation based on such nebulous factors as producer's and director's reputations (both financial and artistic), the subject matter of the picture, and the box-office attraction of the performers. (3) The limited partnership agreement drafted by Wyler's attorney clearly and specifically provided that in the event defendants failed to meet their continuing obligation to obtain production financing Wyler's sole remedy would be a reduction in the producer's fee. Nevertheless, to contradict the express terms of the limited partnership agreement the trial court received parol evidence of a

collateral oral agreement under which defendants personally guaranteed to obtain $750,000 in production financing. Wyler maintained that defendants orally guaranteed to obtain $750,000 in production financing when they executed the March 1 deal memorandum; that when he agreed in July to provide another $100,000 and to purchase forward francs, they orally guaranteed to obtain production financing in the increased amount of $850,000. Wyler testified he and Martin reached these understandings on guarantee and left it to the lawyers to draft the agreements. Wyler conceded that the language which specified a reduction in the producer's fee as his "sole remedy" was part of the agreement, but asserted that the "important" part was defendants' continuing obligation after September 30 to obtain production financing. Wyler contended that defendants had in effect guaranteed the marketability of the picture by their assurances that they would raise $850,000 in production financing.

■ This contention, the keystone of Wyler's case, fails for lack of proof of any mutual mistake, misrepresentation by defendants, misunderstanding of counsel, or side oral guarantees, which might controvert the explicit language of the written limited partnership agreement. Wyler's sole remedy for defendants' failure to raise the money was specified in the agreement as a reduction in the producer's fee. At bench, plaintiff reargues the evidence and raises a newly articulated theory of innocent misrepresentation. It suffices to say that plaintiff had the burden of convincing the jury that (a) plaintiff obtained and justifiably relied upon oral guarantees; (b) the limited partnership agreement did not reflect the true intent of the parties when it specifically limited plaintiff's remedy for defendants' failure to obtain production financing to a reduction in the producer's fee; and (c) defendants' continuing failure to obtain production financing constituted a material failure of consideration. Defendants vigorously disputed those points, and, patently, the jury rejected plaintiff's version of the facts. On appeal, we will not disturb its determination.

2. *Mismanagement.* After Wyler rested his case-in-chief the trial court nonsuited Wyler's cause of action which sought $1.5 million damages for defendants' mismanagement of the limited partnership business. The mismanagement cause of action pleaded misrepresentations about marketability and production financing, plaintiff's reliance on defendants' misrepresentations and promises, and the trust and confidence reposed in defendants by plaintiff. As specifications for the charge of mismanagement Wyler alleged excessive costs of production for the French version of the motion picture, failure to produce a marketable English version,

improvident selection of actors, unseasonable scheduling of photography, failure to obtain production financing, and procurement of disadvantageous distribution contracts.

To support his mismanagement theory of liability plaintiff cites cases holding that a hired professional owes a duty of reasonable care in exercising his expertise for the benefit of the person who hired him.[4] But those cases do not support plaintiff's theory of liability, in that defendants were not hired or employed by plaintiff in any rational sense of the words. Existence of liability for mismanagement depends here on the partnership relation of the parties.

A limited partnership affords a vehicle for capital investment whereby the limited partner restricts his liability to the amount of his investment in return for surrender of any right to manage and control the partnership business. (Corp. Code, § 15507.) In a limited partnership the general partner manages and controls the partnership business. (Corp. Code, § 15509, subd. (1).) In exercising his management functions the general partner comes under a fiduciary duty of good faith and fair dealing toward other members of the partnership. (Corp. Code, § 15021; *Laux v. Freed* (1960) 53 Cal.2d 512, 522 [2 Cal.Rptr. 265, 348 P.2d 873]; *Dennis v. Gordon* (1912) 163 Cal. 427, 433 [125 P. 1063].)

These characteristics—limited investor liability, delegation of authority to management, and fiduciary duty owed by management to investors —are similar to those existing in corporate investment, where it has long been the rule that directors are not liable to stockholders for mistakes made in the exercise of honest business judgment (*Findley v. Garrett* (1952) 109 Cal.App.2d 166, 174, 178 [240 P.2d 421]; *Marsili v. Pacific Gas & Elec. Co.* (1975) 51 Cal.App.3d 313, 324 [124 Cal.Rptr. 313, 79 A.L.R.3d 477]), or for losses incurred in the good faith performance of their duties when they have used such care as an ordinarily prudent person would use. (Corp. Code, § 309, subd. (a).) ■ By this standard a general partner may not be held liable for mistakes made or losses incurred in the good faith exercise of reasonable business judgment.

■ According all due inferences to plaintiff's evidence, as we do on review of a nonsuit, we agree with the trial court that plaintiff did not

[4]*Coberly v. Superior Court* (1965) 231 Cal.App.2d 685, 689 [42 Cal.Rptr. 64] (duty of corporate trustee); *Gagne v. Bertran* (1954) 43 Cal.2d 481, 489 [275 P.2d 15] (general duty of experts and professionals); *Estate of Beach* (1975) 15 Cal.3d 623, 635 [125 Cal.Rptr. 570, 542 P.2d 994] (duty of corporate executor).

produce sufficient evidence to hold defendants liable for bad business management. Plaintiff's evidence showed that the Piaf picture did not make money, was not sought after by distributors, and did not live up to its producers' expectations. The same could be said of the majority of motion pictures made since the invention of cinematography. No evidence showed that defendants' decisions and efforts failed to conform to the general duty of care demanded of an ordinarily prudent person in like position under similar circumstances.[5] The good faith business judgment and management of a general partner need only satisfy the standard of care demanded of an ordinarily prudent person, and will not be scrutinized by the courts with the cold clarity of hindsight. The trial court correctly granted a nonsuit on the mismanagement cause of action.

3. *Jury Instructions.* Plaintiff sought to rescind the limited partnership agreement on a theory of failure of consideration (Civ. Code, §1689, subd. (b) (2)) as a result of defendants' failure to obtain production financing. The jury found against him. The trial court instructed the jury:

"A party to a contract may rescind the contract in any one of the following cases:

"1. If, through the fault of the other party the consideration which he was supposed to receive fails in whole or in a *material* part;

"2. If the consideration he was supposed to receive fails in a *material* respect from any cause before it is rendered to him . . . . [Italics supplied.]"

Plaintiff asserts the absence of any requirement of material failure of consideration in the language of Civil Code section 1689, subdivision (b) (2)[6] makes these instructions erroneous and constitutes prejudicial error. We disagree. Case law has uniformly held that a failure of

---

[5]The 1975 legislative comment to the business judgment standard of Corporations Code section 309 stated: "The reference to 'ordinarily prudent person' emphasizes long traditions of the common law, in contrast to standards that might call for some undefined degree of expertise, like 'ordinarily prudent businessman'; the phrase is not intended to establish the preservation of assets as a priority for the corporate director, but, rather, to recognize the need for innovation as an essential of profit orientation and, in short, to focus on the basic director attributes of common sense, practical wisdom and informed judgment."

[6]Civil Code section 1689 provides in relevant part:
"(b) A party to a contract may rescind the contract in the following cases:
" . . . . . . . . . . . . . . . . . .
"(2) If the consideration for the obligation of the rescinding party fails, in whole or in

consideration must be "material," or go to the "essence" of the contract before rescission is appropriate. (*Crofoot Lumber, Inc.* v. *Thompson* (1958) 163 Cal.App.2d 324, 332-333 [329 P.2d 302]; *Integrated, Inc.* v. *Alec Fergusson Electrical Contractor* (1967) 250 Cal.App.2d 287, 295-296 [58 Cal.Rptr. 503].) Plaintiff's argument—that the 1961 amendment to Civil Code section 1689 (which coincided with the repeal of Civ. Code, § 3406 on equitable rescission) abrogated the need for materiality—ignores the substantial reenactment of Civil Code section 1689 in the same wording it has possessed since its original enactment in 1872. When a statute construed by the courts in a particular fashion is reenacted in substantially the same terms, the Legislature is presumed to have been familiar with that construction and to have adopted it. (*In re Marriage of Skelley* (1976) 18 Cal.3d 365, 369 [134 Cal.Rptr. 197, 556 P.2d 297].) Since Civil Code section 1689, subdivisions (b)(2), (4) substantially reenacted prior law, the judicial construction requiring materiality was, and has been, properly carried forward. The jury instruction was correct.

4. *Inconsistency of Special Verdict.* Plaintiff asserts the general verdict in favor of defendants was inconsistent with the special verdict, appendix A herein, which, he says, found him entitled as matter of law to rescind the agreement on the basis of innocent misrepresentation. We disagree.

The special verdict presented to the jury in the form of special findings requested conclusions of ultimate fact and not findings of specific evidentiary fact. (Code Civ. Proc., § 624.) ■ The law is well settled that, " '[a] special finding is inconsistent with the general verdict only when, as a matter of law, the special finding when taken by itself would authorize a judgment different from that which the general verdict will permit.' Since the special verdict or finding provided for in [Code Civ. Proc.,] section 625 is '. . . primarily and principally for the purpose of determining whether the general verdict is or is not against law' no presumption is to be indulged in favor of answers to special interrogatories and every reasonable intendment in favor of the general verdict is indulged.

"The general and special verdicts must be beyond possibility of reconciliation under any possible application of the evidence and instructions. If any conclusions could be drawn thereunder which would explain the apparent conflict, the jury will be deemed to have drawn

---

part, through the fault of the party as to whom he rescinds.

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"(4) If the consideration for the obligation of the rescinding party, before it is rendered to him, fails in any material respect from any cause."

them." (*Hasson* v. *Ford Motor Company* (1977) 19 Cal.3d 530, 540-541 [138 Cal.Rptr. 705, 564 P.2d 857], citations and sources omitted.)

Plaintiff asserts the special findings establish innocent misrepresentation and his entitlement to rescission as a matter of law. (Cf. *Crocker-Anglo Nat. Bank* v. *Kuchman* (1964) 224 Cal.App.2d 490 [36 Cal.Rptr. 806].) Initially, we note plaintiff did not try the case upon a theory of innocent misrepresentation, and the jury was not instructed on innocent misrepresentation. This basis for rescission is raised for the first time on appeal, and it is predicated on a tortured interpretation of portions of special interrogatories removed from context.

The special interrogatories were presented to the jury in integral sets and sought the jury's ultimate factual determination on: failure of consideration; intentional and negligent false representations; promise without intent to perform; and concealment of material facts. In each set of answers the jury found one or more factors that nullified recovery: i.e., the consideration did not fail in any material respect; plaintiff was not justified in relying on false representations or promises; plaintiff's actions would have been the same if he had known of the concealed or suppressed facts. To take portions of the findings on negligent misrepresentation out of context and ignore the consistent finding of the jury's special verdict that Wyler was not justified in relying upon or believing any erroneous representations and that in fact he had not relied on them, is to distort the findings beyond recognition, particularly in view of the express language of the partnership agreement, impliedly accepted by the jury as limiting defendants' liability for failure to obtain production financing to a reduction in their producer's fee. We conclude that the special verdict was consistent with the general verdict.

Plaintiff further complains that the special interrogatories ". . . are framed in abstract, theoretical language designed to elicit the jury's conclusions on legal issues; they are not in any way designed to elicit information about the jury's determination on the facts of the instant case." Here, plaintiff has a point. But it is not one that affects the outcome of the cause.

For the guidance of trial judges in other cases, we note the disadvantages of saddling a jury with lengthy and involved interrogatories, cocooned in legal terminology and garnished with words of art. At bench the jury was required to answer 28 questions of a technical legal nature, in effect to make written findings of fact and conclusions of law on each issue in the cause, an effort which occupied the jury for 6½ of its 8 days of deliberations. Preparation of written findings and conclusions is not a jury

function, and when detailed questions of such nature are given to a jury, perfect and consistent answers to all questions cannot be expected. Like comparable true-false questions put to students in law school or on bar examinations 100 percent accuracy is not feasible, and anything above 80 percent represents a good grade. While there were some inconsistencies in the jury's answers to questions, the general drift of the jury verdict, both general and special, was clear, and the cumbersomeness of the procedures used had no adverse consequence beyond that of wasted court time. In other causes the result might not be so fortunate. We think concoction of such a broth of questions for the jury serves only as a kind of lawyer's welfare policy, which insures against early cessation of litigation by providing ready-mixed inconsistencies which may be used to attack the jury's verdict in later stages of the case. We therefore urge trial judges to resist the blandishments of counsel seeking to transform jury submission into written cross-examination of each individual juror's conclusions. Trial judges should submit special verdicts to juries only when the number of questions is brief and the questions are couched in nontechnical language. (Cf. equally inappropriate special interrogatories proposed in *Gherman* v. *Colburn* (1977) 72 Cal.App.3d 544, 589 [140 Cal.Rptr. 330].)

5. *Jury Confusion.* The burdensomeness of the questions put to the jury was dramatically illustrated by the attempt to poll each individual juror on his individual answers to each of 28 interrogatories. Plaintiff asserts the resulting confusion in the jury poll demonstrates error. Without belaboring this point, it is clear the jurors rejected rescission for failure of consideration (9 to 3); rejected reliance on intentional misrepresentations (12 to 0); rejected fraudulent concealment (12 to 0); rejected reliance on negligent misrepresentations (9 to 3); rejected promise without intent to perform (9 to 3); and rejected the contention that plaintiff would have acted differently if he had known of concealed facts (10 to 2). The trial judge diligently supervised the jury poll, and the minor discrepancies between the reporter's transcript and the clerk's minutes are inconsequential. Since at least nine jurors voted against plaintiff on a key element in each cause of action we find no material confusion in the jury's verdict.

The judgment is affirmed.

Roth, P. J., and Compton, J., concurred.

A petition for a rehearing was denied November 7, 1978, and appellant's petition for a hearing by the Supreme Court was denied January 17, 1979. Mosk, J., did not participate therein.

APPENDIX "A"

SPECIAL FINDINGS BY THE JURY

We, the Jury in the above-entitled cause, answer the questions propounded by the Court as follows:

A. AS TO RESCISSION:

Yes ( ) No (X) Question No. 1: Did the consideration which plaintiff was supposed to receive fail in whole or in a material part through the fault of the defendants?

Yes ( ) No (X) Question No. 2: Did the consideration which plaintiff was supposed to receive fail in a material respect from any cause before it was rendered to him?

B. AS TO INTENTIONAL MISREPRESENTATION.

Yes (X) No ( ) Question No. 1: Did the defendants make a representation as to a past or existing material fact?

Yes (X) No ( ) Question No. 2: Was the representation false?

Yes ( ) No (X) Question No. 3: Did the defendants know that the representation was false when they made it?

Yes ( ) No. (X) Question No. 4: Did the defendants make the representation with an intent to defraud the plaintiff?

Yes (X) No ( ) Question No. 5: Was the plaintiff unaware of the falsity of the representation?

Yes (X) No ( ) Question No. 6: Did the plaintiff act in reliance upon the truth of the representation?

Yes ( ) No (X) Question No. 7: Was the plaintiff justified in relying upon the representation?

C. AS TO CONCEALMENT

Yes (X) No ( ) Question No. 1: Did the defendants conceal or suppress a material fact?

Yes ( ) No (X) Question No. 2: Were the defendants under a duty to disclose the fact to plaintiff?

Yes ( ) No (X) Question No. 3: Did the defendants intentionally conceal or suppress the fact with the intent to defraud the plaintiff?

Yes (X) No ( ) Question No. 4: Was the plaintiff unaware of the fact?

Yes (X) No ( ) Question No. 5: Would plaintiff have acted as he did if he had known of the concealed or suppressed fact?

D. AS TO PROMISE WITHOUT INTENT TO PERFORM.

Yes (X) No ( ) Question No. 1: Did the defendants make a promise as to a material matter?

Yes ( ) No (X) Question No. 2: At the time they made the promise, did the defendants make the promise without intending to perform it?

Yes ( ) No (X) Question No. 3: Did the defendants make the promise with an intent to defraud the plaintiff?

Yes (X) No ( ) Question No. 4: Was the plaintiff unaware of the defendants' intention not to perform the promise?

Yes (X) No ( ) Question No. 5: Did the plaintiff act in reliance upon the promise?

Yes ( ) No (X) Question No. 6: Was the plaintiff justified in relying upon the promise?

E. AS TO NEGLIGENT MISREPRESENTATION

Yes (X) No ( ) Question No. 1: Did the defendants make a representation as to a past or existing material fact?

Yes (X) No ( ) Question No. 2: Was the representation false?

Yes ( ) No (X) Question No. 3: Did the defendants make the representation without any reasonable ground for believing it to be true?

Yes (X) No ( ) Question No. 4: Did the defendants make the representation with the intent to induce the plaintiff to rely upon it?

Yes (X) No ( ) Question No. 5: Was the plaintiff unaware of the falsity of the representation?

Yes (X) No ( ) Question No. 6: Did the plaintiff act in reliance upon the truth of the representation?

Yes ( ) No (X) Question No. 7: Was the plaintiff justified in relying upon the representation?

F. AS TO PUNITIVE DAMAGES

Yes ( ) No (X) Question No. 1: If you find that defendants were guilty of fraud, is the plaintiff entitled to exemplary or punitive damages in addition to the restitution of the funds which he invested in the limited partnership?

$_____ Question No. 2: What amount of punitive or exemplary damages is plaintiff entitled to?

Dated: 3/2/77

/s/     Robert H. Nida
Foreman