[No. B191028. Second Dist., Div. Six. Nov. 29, 2007.]

GUY WYSINGER, Plaintiff and Appellant, v.
AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA, Defendant and
Appellant.

414

## COUNSEL

Hadsell & Stormer, Dan Stormer, Virginia Keeny; Murray & Whitehead and Nigel A. Whitehead for Plaintiff and Appellant.

Reed Smith, Margaret M. Grignon, Zareh Jaltorossian; Sheppard Mullin Richter & Hampton, Jeffrey A. Dinkin, Deborah Lynn Martin and John K. Beckley for Defendant and Appellant.

## OPINION

**GILBERT, P. J.**—An employee sued his employer for various discrimination claims under the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.). Among other things, the jury found the employer liable for its failure to engage in an "interactive process" to determine reasonable accommodation for the employee's disability. The jury found the employer not liable, however, for the claim it failed to provide a reasonable accommodation for the employee's disability. Here we conclude these jury findings require different proofs and are not inconsistent.

Defendant Automobile Club of Southern California (ACSC) appeals a judgment after jury trial. Guy Wysinger filed a discrimination action against ACSC, his former employer. We affirm because (1) substantial evidence supports the finding that ACSC unlawfully retaliated against Wysinger for filing an age discrimination claim; (2) the court did not commit reversible error with an instruction on retaliatory employer conduct; (3) the jury verdicts were consistent; (4) substantial evidence supports the findings that ACSC's conduct damaged Wysinger; (5) the $1 million punitive damages award was not excessive; and (6) the court properly apportioned the award of attorney fees to Wysinger.

FACTS

Wysinger was a district manger for ACSC's Santa Barbara office. He had received favorable performance evaluations during the 25 years of his employment. He suffered from lupus, a heart condition, and rheumatoid arthritis. His daily commute to Santa Barbara aggravated his arthritis. He wanted to be ACSC's Ventura office manager because it would involve a less arduous commute, and would be a promotion.

In the late 1990's, ACSC decided to implement a new compensation plan. ACSC's older office managers opposed it because they would receive a disproportionate reduction in their compensation.

Robert Kane, ACSC's vice-president of district office operations, called Wysinger into his office and told him, "[W]e are going to crush" those opposing the plan. Kane told Michael Coleman, another senior manager who opposed the plan, that ACSC would not tolerate opposition to it. He said, "It doesn't matter what you did for this company in the last 30 . . . years. None of that matters. And you can die at your desk. We'll replace you tomorrow. Nobody cares."

In 1999, Wysinger filed a complaint with the Equal Employment Opportunity Commission (EEOC) claiming ACSC committed age discrimination. ACSC did not impose the pay cuts.

Wysinger's work environment changed. ACSC no longer invited him to be on management committees or to apply for management positions. He was treated coldly and ignored at management meetings. ACSC ignored requests to accommodate his disabilities. He received unfavorable job evaluations. Bill Figge, his immediate supervisor, said it was not about Wysinger's performance, but involved one of Wysinger's staff members who needed improvement. ACSC transferred staff from Wysinger's office to Ventura, creating a hardship for him.

In 2002, there was an opening for a manager in ACSC's Ventura office, a position that Wysinger wanted. Figge testified that Wysinger ran an "elite," or extremely well-managed office, unlike the one operated by employee Grant Sigmund. Figge recommended Wysinger for the job because he was the most qualified and had formerly managed the Ventura office. Kane agreed.

Peter McDonald, an ACSC senior vice-president, met with Kane. McDonald testified, "[W]e were . . . trying to change the culture of the organization . . . . We were actively trying to get people from other parts of the company to apply." Wysinger was not reassigned to Ventura and ACSC posted the position to attract other applicants. Several people applied, Sigmund did not. Nevertheless, Kane recommended Sigmund for the position and McDonald approved it.

Wysinger testified that because of ACSC's conduct he became depressed and was unable to work. Dr. Alan Karbelnig, a psychotherapist, testified Wysinger suffered from depression because of the way he was treated at ACSC. Stephanie Rizzardi-Pearson, a forensic economist, testified that given Wysinger's age and inability to work he would suffer a $280,129 loss in future earnings.

### The Jury Verdict

In its special verdict, the jury found (1) that ACSC did not "fail to provide a required reasonable accommodation to . . . Wysinger for his physical disability"; (2) ACSC did not discriminate against him because of his physical disability; (3) ACSC retaliated against Wysinger because he filed a complaint of age discrimination; (4) ACSC did not discriminate against him because of his age; and (5) ACSC failed to engage in an interactive process regarding his disability. It found Wysinger sustained economic damages of $204,000, noneconomic damages of $80,000 and ACSC's conduct was "malicious, oppressive, and/or fraudulent."

### Evidence on ACSC's Financial Position

Victor Robinette, a certified public accountant, testified that ACSC's net worth was $353,791,000. John Boyle, ACSC's expert, testified the net worth was the same amount. He said ACSC's profits are placed into a "member equity fund." The trial court sustained objections to ACSC's questions to Boyle about the interest the equity fund earns. ACSC made an offer of proof in a sidebar conference that was not reported. The jury awarded $1 million in punitive damages.

*Attorney Fees*

The trial court awarded Wysinger attorney fees of $978,791. ACSC requested that the fees be apportioned. The court denied that request.

## DISCUSSION

### I. *Substantial Evidence Supporting the Finding of Retaliation*

ACSC contends the evidence is not substantial to support the finding that it retaliated against Wysinger because he filed an age discrimination claim. We presume there is evidence to support every finding unless the appellant demonstrates otherwise and we draw all reasonable inferences from the record to support the judgment. (*Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 152 [135 Cal.Rptr. 802].)

■ ACSC contends denying Wysinger a transfer to Ventura is not a FEHA adverse employment action. Plaintiff must show that he or she engaged in protected activity and was thereafter subjected to adverse employment action by his or her employer because of that protected activity. (*Morgan v. Regents of the University of California* (2000) 88 Cal.App.4th 52, 69 [105 Cal.Rptr.2d 652].) Where an employer retaliates by denying prospects for advancement or promotions to employees because they filed age discrimination claims, the employer has engaged in an adverse employment action in violation of FEHA. (Gov. Code, § 12940, subd. (h); *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1055 [32 Cal.Rptr.3d 436, 116 P.3d 1123] (*Yanowitz*); *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 895–896 [66 Cal.Rptr.2d 888, 941 P.2d 1157].)

ACSC claims that the Ventura position would not have changed Wysinger's employment status. Sandi Adame, ACSC's human resources manager, testified, however, it would have been a promotion. Kane said it involved a higher classification within management, and offered higher salary.

■ ACSC contends it is not responsible for Kane's retaliatory conduct. But an employer generally can be held liable for the retaliatory actions of its supervisors. (*Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 109, fn. 9 [16 Cal.Rptr.3d 717] (*Reeves*).) Here Kane supervised ACSC's managers. His threat to "crush" the managers opposed to ACSC's plan shows an intent to retaliate. Jurors could reasonably infer Wysinger became one of those targeted managers after he filed the EEOC claim and challenged the plan.

ACSC claims that McDonald independently decided not to promote Wysinger and was not influenced by Kane. But McDonald said he followed Kane's final recommendation to reject Wysinger and routinely relied on Kane's advice about managers. Kane knew Wysinger had more experience than Sigmund, that Wysinger's office was classified as elite and Sigmund's was not. The jury could find that Kane agreed with Figge that Wysinger was the best qualified, but selected Sigmund even though he had not applied for the position. It could reasonably infer that McDonald relied on Kane in making this selection.

ACSC argues that McDonald did not know that Wysinger filed an age discrimination claim and was motivated by neutral business justifications. But the jury could reasonably infer that anyone in his position would know about the EEOC complaint because of its financial impact on the company. In addition, jurors could infer the sudden decision to "change the culture" instead of approving Wysinger's transfer was a pretext to deny Wysinger what should have been a routine reassignment. Wysinger had previously managed the Ventura office.

In any event, a decision maker's ignorance does not "categorically shield the employer from liability if other substantial contributors to the decision bore the requisite animus. [Citation.]" (*Reeves, supra,* 121 Cal.App.4th at p. 110.) If he participated in the decision, jurors may infer animus. (*Roebuck v. Drexel University* (3d Cir. 1988) 852 F.2d 715, 727.) Because Kane was a motivating force in the selection, his animus is imputed to ACSC. (*Reeves, supra,* at p. 110.) Moreover, notwithstanding McDonald's alleged ignorance, ACSC must have known Wysinger made the EEOC claim. This prevented ACSC from implementing its plan to reduce employee compensation. Jurors could find it had a motive to retaliate.

ACSC notes that Wysinger filed the EEOC claim in December 1999. The decision not to transfer him to Ventura occurred between 2002 and 2003. It claims these events are too remote to be causally connected. A long period between an employer's adverse employment action and the employee's earlier protected activity may lead to the inference that the two events are not causally connected. (*Paluck v. Gooding Rubber Co.* (7th Cir. 2000) 221 F.3d 1003, 1010.) But if between these events the employer engages in a pattern of conduct consistent with a retaliatory intent, there may be a causal connection. (*Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 823 [111 Cal.Rptr.2d 87, 29 P.3d 175]; see also *Podkovich v. Glazer's Distributors of Iowa, Inc.* (N.D. Iowa 2006) 446 F.Supp.2d 982, 1009 [employer treating employee with hostility or rudeness]; *Kim v. Nash Finch Co.* (8th Cir. 1997) 123 F.3d 1046, 1061 [excluding employee from discretionary assignments and meetings].) Here Wysinger was not invited to serve on management committees or to apply for management positions and was treated with "coldness."

ACSC ignored Wysinger's repeated requests to discuss his health and commute problems. In 2000, ACSC's upper management did not respond to Wysinger's letters concerning the difficulties occasioned by his heart and lupus conditions. In 2001, his health was deteriorating. Wysinger made six to 12 requests to his immediate supervisor for some accommodation because of his health problems. The ACSC's human resources department did not respond to any of those requests. In 2002, Wysinger's doctor wrote to ACSC about Wysinger's health conditions. This evidence supports the jury's findings that ACSC refused to engage in an interactive process to discuss his disabilities and that it acted with malice. In late 2002 and early 2003, when the position was available in the Ventura office, Wysinger's immediate supervisor told him that ACSC's upper management would not allow him to have it. He candidly admitted to Wysinger, "I can't defend it . . . . I just have to do what I have to do." In denying ACSC's motion for a new trial, the trial court found that Wysinger had proven retaliatory animus from Kane and through the "chain of command . . . up the line to Mr. McDonald."

## II.   *Jury Instruction on Retaliatory Employer Conduct*

ACSC contends the court's instructions on employer retaliation are reversible error. We disagree.

The trial court instructed jurors: "Guy Wysinger claims that the [ACSC] retaliated against him for his complaint of age discrimination with the EEOC. To establish this claim, Mr. Wysinger must prove all of the following: 1) [t]hat he was an employee of the [ACSC]; 2) [t]hat he made a complaint to the EEOC; 3) [t]hat the [ACSC] took an adverse employment action against Mr. Wysinger; 4) [t]hat Mr. Wysinger's filing of an age discrimination complaint with the EEOC was a motivating reason for the [ACSC's] adverse employment action against him; 5) [t]hat Mr. Wysinger was harmed, and; 6) [t]hat the [ACSC's] retaliatory conduct was a substantial factor in causing his harm."

ACSC requested an instruction on adverse employment action which the trial court rejected. That proposed instruction stated, among other things: "In deciding whether an adverse employment action has occurred, you must bear in mind that an adverse employment action connotes particular conduct. The employment action must be both detrimental and substantial. It must also result in a material change in the terms and conditions of employment."

ACSC contends the trial court's instruction was inadequate under *Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441 [116 Cal.Rptr.2d 602] (*Akers*). There, the Court of Appeal held that instructions on employer retaliation are insufficient without the phrase, "the employer's retaliatory

conduct must have had a *substantial and material* adverse effect on the terms and conditions of . . . employment." (*Id.* at p. 1459.) It noted that without such language, jurors could believe that adverse employment action means "anything that happens to an employee that is not in his or her favor." (*Ibid.*)

■ A few years later in *Yanowitz*, our Supreme Court stated: "[T]he determination of what type of adverse treatment [suffices] . . . is not, by its nature, susceptible to a mathematically precise test . . . ." (*Yanowitz, supra*, 36 Cal.4th at p. 1054.) The court should consider "plaintiff's allegations collectively under a totality-of-the-circumstances approach" (*id.* at p. 1052, fn. 11) by taking "into account the legitimate interests of both the employer and the employee. Minor or relatively trivial adverse actions" do not suffice. (*Id.* at p. 1054.) But an adverse action that "is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of" FEHA. (36 Cal.4th at pp. 1054–1055.) The court noted that the collective impact of a series of retaliatory acts may constitute sufficient adverse employment action even if some of the acts individually would not. (*Id.* at pp. 1055–1056.) It concluded, "Enforcing a requirement that each act separately constitute an adverse employment action would subvert the purpose and intent of the statute. [Fn. omitted.]" (*Id.* at p. 1056.)

ACSC correctly notes that the trial court's instruction omits the language suggested by *Akers*, but this does not change the result. "[A] court's failure to properly instruct is reversible only if the appellant shows it is reasonably probable it would have obtained a more favorable result if there had been the proper instruction. [Citation.]" (*Akers, supra*, 95 Cal.App.4th at p. 1459.)

ACSC has not met that burden. The court's instruction required jurors to find that the retaliation was a substantial factor, which caused harm to Wysinger. The court also gave a special instruction advising jurors (1) that they could not interfere with ACSC's legitimate exercise of management discretion; (2) they should not judge ACSC's managers' reasons for their decisions based on what jurors felt they would have done; and (3) they should defer to ACSC's management discretion unless they found ACSC was motivated by retaliation. The combined effect of these instructions required jurors to decide the retaliation issue by excluding employer conduct that would be trivial under *Yanowitz* or insubstantial under *Akers*. It required jurors not to include management decisions which involved ordinary discretion, even if the jurors found the conduct to be unfair. Wysinger had to prove animus and retaliation.

Moreover, ACSC's actions had a substantial and material impact on the conditions of employment. The refusal to promote Wysinger is an adverse employment action under FEHA. (*Yanowitz, supra*, 36 Cal.4th at p. 1055.) There was also a pattern of conduct, the totality of which constitutes an adverse employment action. This includes undeserved negative job reviews, reductions in his staff, ignoring his health concerns and acts that caused him substantial psychological harm. Kane's statements are patent evidence of retaliatory intent and his threats were unlawful under FEHA. In addition, the jury found ACSC's actions were more than retaliatory, they were egregious, as shown by the findings on punitive damages.

### III. *Inconsistent Verdicts Negating Interactive Process Liability*

ACSC notes that the jury found that ACSC failed to engage in an interactive process regarding Wysinger's disability. It also found ACSC did not fail to provide a required reasonable accommodation to Wysinger for his physical disability. ACSC claims the jury's verdict is inconsistent and must be reversed along with the award of $284,000 in compensatory damages. " 'A verdict should be interpreted so as to uphold it and give it the effect intended by the jury . . . .' " (*All-West Design, Inc. v. Boozer* (1986) 183 Cal.App.3d 1212, 1223 [228 Cal.Rptr. 736] (*All-West Design*).) Where special verdicts appear inconsistent, if any conclusions could be drawn which would explain the apparent conflict, the jury will be deemed to have drawn them. (*Wyler v. Feuer* (1978) 85 Cal.App.3d 392, 404–405 [149 Cal.Rptr. 626].)

Here the verdicts on the reasonable accommodation issue and the interactive process claim are not inconsistent. They involve separate causes of action and proof of different facts. Under FEHA, an employer must engage in a good faith interactive process with the disabled employee to explore the alternatives to accommodate the disability. (Gov. Code, § 12940, subd. (n); *Claudio v. Regents of the University of California* (2005) 134 Cal.App.4th 224, 242 [35 Cal.Rptr.3d 837] (*Claudio*) [employer may not fail to engage in a timely, good faith interactive process to determine effective reasonable accommodations].) "An employee may file a civil action based on the employer's failure to engage in the interactive process." (*Claudio, supra*, at p. 243.) Failure to engage in this process is a separate FEHA violation independent from an employer's failure to provide a reasonable disability accommodation, which is also a FEHA violation. (Gov. Code, § 12940, subd. (m); *Gelfo v. Lockeed Martin Corp.* (2006) 140 Cal.App.4th 34, 61 [43 Cal.Rptr.3d 874] (*Gelfo*); *Claudio, supra*, at p. 242 [employer may not fail to make a reasonable accommodation].) An employer may claim there was no available reasonable accommodation. But if it did not engage in a good faith interactive process, "it cannot be known whether an alternate job would have

been found." (*Claudio, supra*, at p. 245.) The interactive process determines which accommodation is required. (*Ibid.*; *Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 263, fn. 7 [102 Cal.Rptr.2d 55] (*Jensen*).) Indeed, the interactive process could reveal solutions that neither party envisioned.

Here the jury could find there was no failure to provide a required accommodation because the parties never reached the stage of deciding which accommodation was required. ACSC prevented this from happening by its refusal to engage in the interactive process.

■ Relying on Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101 et seq.) cases, ACSC argues that to prevail on a FEHA interactive process claim (Gov. Code, § 12940, subd. (n)), Wysinger had to also prove a violation of Government Code section 12940, subdivision (m) (failure to provide reasonable accommodations). We disagree. Federal ADA cases are generally helpful in interpreting FEHA. But not where they undermine provisions of California law that provide more protections to employees than the ADA. (*Gelfo, supra*, 140 Cal.App.4th at p. 57.) No provision in the ADA imposes liability on employers who refuse to engage in the interactive process. (*Cravens v. Blue Cross and Blue Shield* (8th Cir. 2000) 214 F.3d 1011, 1021.) An employee who proves such bad faith employer conduct has no remedy unless he or she also shows that his or her disability could have been reasonably accommodated. (*Ibid.*)

By contrast, FEHA allows an independent cause of action for employees whose employers fail to engage in the interactive process. This provision does not require proof of the elements required by the ADA. (Gov. Code, § 12940, subd. (n); *Claudio, supra*, 134 Cal.App.4th at p. 243.) The federal ADA cases that hold that employers are not liable for refusal to engage in an interactive process are therefore inapposite. (*Gelfo, supra*, 140 Cal.App.4th at p. 57.)

ACSC's position would render Government Code section 12940, subdivision (n), superfluous. Employers who violate subdivision (n) by withholding information that could lead to a reasonable accommodation could avoid liability for violation of section 12940, subdivision (m). (*Jensen, supra*, 85 Cal.App.4th at p. 262.) " 'Employees do not have at their disposal the extensive information concerning possible alternative positions or possible accommodations which employers have. . . .' " (*Ibid.*) Even some federal courts in ADA cases have concluded that "an employer who has received proper notice cannot escape its duty to engage in the interactive process simply because the employee did not come forward with a reasonable accommodation that would prevail in litigation." (*Taylor v. Phoenixville School Dist.* (3d Cir. 1999) 184 F.3d 296, 317 (*Taylor*).)

Nor does the reasonable accommodation verdict in ACSC's favor mean the jurors found that it acted in good faith on the interactive process claim. (*Gelfo, supra,* 140 Cal.App.4th at p. 58, fn. 18.) It is true an employer's good faith during the interactive process may support an inference that its decision not to provide accommodation was also made in good faith. But here the jury decided ACSC's conduct was "malicious, oppressive and/or fraudulent." The jury could find ACSC liable because it obstructed the process to determine a reasonable accommodation. (*Claudio, supra,* 134 Cal.App.4th at pp. 245, 248 [evidence showing that no alternative jobs were available did not insulate employer from liability for not engaging in an interactive process]; *Taylor, supra,* 184 F.3d at p. 318 ["jury is entitled to bear in mind that had the employer participated in good faith, there may have been other, unmentioned possible accommodations"].)

Wysinger requested an accommodation involving his commute. ACSC argues that the jury's finding on the accommodation issue shows that it acted reasonably by not accommodating his request. But as Wysinger notes, during deliberations the jury asked whether it could consider the commute in deciding reasonable workplace accommodation. The court responded: "The work place includes any office of the [ACSC] where its employees do work for the company. It does not include the commute."

The jury likely rendered its verdict on the accommodation issue solely because of this instruction. (See *Bagatti v. Dept. of Rehab.* (2002) 97 Cal.App.4th 344, 369–370 [118 Cal.Rptr.2d 443] [disabled employee's request that employer provide motorized transportation from parking lot to office not unreasonable]; *Sargent v. Litton Systems, Inc.* (N.D.Cal. 1994) 841 F.Supp. 956, 961 [rejecting employer's claim that it had no duty under FEHA to accommodate disabled employee who experienced pain in driving to work].)

ACSC argues that the jury had to find that ACSC had no duty to engage in an interactive process after it rejected Wysinger's transfer because he did not request alternative accommodation. The trial court instructed jurors: "The employer must explore various accommodations even if the employee has not requested any . . . . An employer . . . who rejects the other's proposed accommodations and offers no effective alternative fails to engage in good faith in the mandatory interactive process." Wysinger testified that ACSC did not offer any specific accommodation even after his doctor wrote to the company on his behalf. (*Taylor, supra,* 184 F.3d at p. 317.)

*Sufficiency of the Verdict on Interactive Process Damages*

ACSC contends reversal is required because the jury did not specify which damages are attributable to the interactive process claim and which are

attributable to the retaliation claim. But as Wysinger notes, it has waived this argument because it did not request specific findings on the damages for each successful claim. (*Conrad v. Ball Corp.* (1994) 24 Cal.App.4th 439, 444 [29 Cal.Rptr.2d 441].)

This was a general verdict. " 'Where several counts or issues are tried, a general verdict will not be disturbed by an appellate court if a single one of such counts or issues is supported by substantial evidence and is unaffected by error . . . .' [Citations.]" (*Bresnahan v. Chrysler Corp.* (1998) 65 Cal.App.4th 1149, 1153 [76 Cal.Rptr.2d 804].) ACSC has neither demonstrated that there was a lack of substantial evidence nor has it shown why or how the damages for either claim would be different. (*All-West Design, supra,* 183 Cal.App.3d at p. 1223 [no matter how many theories of recovery were stated or proved, respondents were entitled to but one recovery].)

### IV. *Damages Caused by Retaliation and Wysinger's Inability to Work*

■ ACSC contends that there is no evidence that its retaliatory conduct either prevented Wysinger from working or caused economic damages. Under FEHA, an employee who has been subjected to retaliation which prevents him or her from working may be compensated for a future loss of earnings. (*Hope v. California Youth Authority* (2005) 134 Cal.App.4th 577, 595 [36 Cal.Rptr.3d 154].) " '[T]he jury is entrusted with vast discretion in determining the amount of damages . . . .' [Citation.]" (*Ibid.*)

Wysinger testified that because of ACSC's conduct, he became depressed, "worn out" and unable to return to work. Karbelnig stated that Wysinger suffered from dysthymia, a form of depression, caused by his "feeling of betrayal" by his employer, stress and his emotional reaction to ACSC's actions. Rizzardi-Pearson opined that based on Wysinger's inability to work and his age, he would suffer a loss of future earnings of $280,129.

### *Posttrial Evidence on Wysinger's Ability to Work*

ACSC claims that after trial Wysinger did not cease working for it and continued to be employed in the district manager position. But the record refutes this. ACSC moved for a new trial attaching a form Wysinger sent to ACSC's retirement department after trial. He checked a box stating, "I do not plan to take retirement at this time." ACSC claimed the judgment for future lost wages should be vacated because this form showed Wysinger was able to work.

But the form was designed to calculate retirement benefits. There was no question on the form about whether Wysinger could work. Moreover, Wysinger opposed the motion, claiming ACSC misrepresented the facts. He attached the declaration of Virginia Keeny who said Wysinger had not returned to work at ACSC. He had been unable to work since trial and ACSC placed him on disability leave. The trial court acted within its discretion and denied the new trial motion. (*Miller v. National American Life Ins. Co.* (1976) 54 Cal.App.3d 331, 345 [126 Cal.Rptr. 731].)

## V.  *Punitive Damages*

### A.  *Conduct Sufficient to Support the Award*

■  ACSC contends there is no evidence to support punitive damages because its conduct did not involve malice, oppression or fraud. Punitive damages are properly awarded "when the tortious conduct rises to levels of extreme indifference to the plaintiff's rights, a level which decent citizens should not have to tolerate." (*Flyer's Body Shop Profit Sharing Plan v. Ticor Title Ins. Co.* (1986) 185 Cal.App.3d 1149, 1154 [230 Cal.Rptr. 276].) ACSC knew its older managers objected to its compensation reduction plan. Jurors could reasonably infer it used pretexts to deny Wysinger a transfer and created a hostile work environment in retaliation for his EEOC complaint. Kane told Wysinger, "[W]e are going to crush" the managers opposed to the plan. He told Coleman, "It doesn't matter what you did for this company in the last 30 . . . years. None of that matters. And you can die at your desk. We'll replace you tomorrow. Nobody cares." The jury could find that this callous and retaliatory conduct merits an award of punitive damages. (*Roberts v. Ford Aerospace & Communications Corp.* (1990) 224 Cal.App.3d 793, 801–802 [274 Cal.Rptr. 139] (*Roberts*); *Monge v. Superior Court* (1986) 176 Cal.App.3d 503, 511 [222 Cal.Rptr. 64].)

■  ACSC contends Kane's conduct is irrelevant as he was not a managing agent. Corporate punitive damage liability is limited to the actions by managing agents who are defined as "employees who exercise substantial independent authority and judgment over decisions that ultimately determine corporate policy." (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 573 [88 Cal.Rptr.2d 19, 981 P.2d 944].) "[S]upervisors who have broad discretionary powers and exercise substantial discretionary authority in the corporation could be managing agents." (*Id.* at p. 577.)

Here the jury could find Kane was a managing agent. He was the vice-president of district office operations with jurisdiction over offices in Southern California, Texas, Hawaii and New Mexico. Five regional managers and a regional vice-president in Texas reported directly to him. Kane said he

managed "all of our district offices, all of the service delivery, all of the products that we sell . . . facility management, public affairs. Everything that goes on except for the sales of membership and insurance . . . ." He was responsible for day-to-day operations and strategy. He had the authority to move district managers to different offices. Jurors could find that ACSC gave Kane discretion to decide how to punish managers and "fostered tolerance" of his retaliation by not repudiating his conduct. (*Roberts, supra,* 224 Cal.App.3d at pp. 801–802.)

### B. *Proportionality*

■ ACSC claims the punitive damages are excessive and constitutionally disproportionate. We disagree. The punitive damages are $1 million, the compensatory damages are $280,000. The punitive award is less than four times greater than the compensatory award. This falls within the range of multipliers that are commonly used to achieve the goals of punitive damages. (*Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 967 [43 Cal.Rptr.3d 468] (*Century Sur. Co.*).) Courts often impose "sanctions of double, treble, or quadruple damages to deter and punish." (*State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, 425 [155 L.Ed.2d 585, 123 S.Ct. 1513].) Such "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with" higher ratios. (*Ibid.*) Moreover, here the award is not excessive in light of ACSC's conduct, the harm it caused Wysinger and ACSC's substantial financial position. (*Ibid.*)

■ ACSC contends the court improperly excluded relevant evidence about its financial condition. Evidence about a defendant's financial condition is necessary to determine punitive damages. (*Adams v. Murakami* (1991) 54 Cal.3d 105, 114 [284 Cal.Rptr. 318, 813 P.2d 1348] (*Adams*).) " '. . . [T]he absence of evidence of net worth precludes an appellate court from deciding whether an award might, for example, bankrupt the defendant.' [Citation.]" (*Ibid.*) Here ACSC's net worth was uncontradicted. Robinette said it was $353,791,000. Boyle agreed. Boyle said ACSC's profits are placed into a member equity fund.

ACSC claims the trial court prevented Boyle from testifying about other issues. It notes the trial court sustained an objection to questions about the interest the equity fund earns. There was a sidebar to discuss ACSC's offer of proof. But there is no reporter's transcript of that proceeding and no settled statement. Where the record is silent we must presume the court correctly ruled based on what occurred in the unreported proceedings. (*National Secretarial Service, Inc. v. Froehlich* (1989) 210 Cal.App.3d 510, 522 [258 Cal.Rptr. 506].)

During trial, the court said ACSC's effort to present evidence about how it acquires its wealth or holds it or uses it was remote from the issue of net worth. The trial court has broad discretion to exclude time-consuming evidence of limited probative value that is collateral to the issue of net worth. (Evid. Code, § 352; *Century Sur. Co., supra,* 139 Cal.App.4th at p. 962.) ACSC has not shown an abuse of discretion.

The court did not prevent ACSC from presenting additional evidence on net worth or about its financial reports. ACSC has also not shown how a $1 million award is disproportionate or how it would bankrupt a company with a $354 million net worth and total assets of $961 million. (*Adams, supra,* 54 Cal.3d at p. 114; see also *Century Sur. Co., supra,* 139 Cal.App.4th at pp. 966–967 [award was not excessive where punitive damages were $2,015,000 and defendant's net worth was $56,921,567].)

## VI.   *Attorney Fees*

█ ACSC contends the attorney fees awarded to Wysinger are excessive. It notes that Wysinger prevailed on some but not all causes of action. It argues the trial court should have reduced and apportioned the fees. The amount of fees is within the sound discretion of the trial court and the trial judge is in the best position to evaluate the quality of legal services at trial. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096 [95 Cal.Rptr.2d 198, 997 P.2d 511]; *Downey Cares v. Downey Community Development Com.* (1987) 196 Cal.App.3d 983, 997 [242 Cal.Rptr. 272] (*Downey Cares*).)

Here the court calculated the fees using the lodestar method. It said adjustments were made to the hours to account for inefficient or duplicative efforts. It determined the lodestar to be $889,810. It then elected to enhance the lodestar "by an upward multiplier of 1.1," for a total award of $978,791.

ACSC points out that Wysinger alleged eight causes of action, but prevailed on a retaliation cause of action and a claim that ACSC did not engage in a disability interactive process. It notes that in *Hensley v. Eckerhart* (1983) 461 U.S. 424, 440 [76 L.Ed.2d 40, 103 S.Ct. 1933], the Supreme Court stated: "Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee." But the court also said: "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation . . . . In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. [Citation.]" (*Id.* at p. 435.)

Here the trial court found that Wysinger obtained excellent results and apportionment of fees was not appropriate because the "issues in the case were common to one another and . . . intertwined . . . ." ACSC claims the causes of action were unrelated and distinct. We disagree. All involved underlying disability and age discrimination issues and are based on 52 paragraphs of facts in Wysinger's complaint, which he alleged were common to all causes of action. "[E]mployment discrimination cases, by their very nature, involve several causes of action arising from the same set of facts." (*Brown v. Superior Court* (1984) 37 Cal.3d 477, 486 [208 Cal.Rptr. 724, 691 P.2d 272].)

ACSC claims that the FEHA retaliation cause of action only involved proof that Wysinger made an age discrimination claim and ACSC retaliated. But the trial court could find that in proving retaliation Wysinger tried to show why he felt justified in filing the age discrimination claim. This required proof of his work history and evidence of age discrimination. "[A] competent attorney must do more at trial than present just the bare bones of [a] prima facie case . . . ." (*Merriweather v. Family Dollar Stores of Indiana* (7th Cir. 1996) 103 F.3d 576, 584, italics omitted.) Moreover, Wysinger prevailed on the interactive process claim which involves proof of disability.

ACSC claims the award compensates Wysinger's counsel for time spent on unsuccessful issues. But "[w]here a lawsuit consists of related claims, and the plaintiff has won substantial relief, a trial court has discretion to award all or substantially all of the plaintiff's fees even if the court did not adopt each contention raised." (*Downey Cares, supra,* 196 Cal.App.3d at p. 997.) "To reduce the attorneys' fees of a successful party because he did not prevail on all his arguments, makes it the attorney, and not the defendant, who pays the costs of enforcing" the plaintiff's rights. (*Sundance v. Municipal Court* (1987) 192 Cal.App.3d 268, 273 [237 Cal.Rptr. 269]; see also *Greene v. Dillingham Construction N.A., Inc.* (2002) 101 Cal.App.4th 418, 423 [124 Cal.Rptr.2d 250]; *Beaty v. BET Holdings, Inc.* (9th Cir 2000) 222 F.3d 607, 612 [party seeking reduction of a successful FEHA plaintiff's attorney fees must meet a high threshold].) ACSC has not shown an abuse of discretion.

We have reviewed the parties' remaining contentions and we conclude they do not change the result.

Wysinger's appeal concerning an erroneous jury instruction is moot.

The judgment is affirmed. Costs on appeal are awarded to Wysinger.

Coffee, J., and Perren, J., concurred.

A petition for a rehearing was denied December 28, 2007, and the petition of appellant Automobile Club of Southern California for review by the Supreme Court was denied February 20, 2008, S159777.